DELAWARE VALLEY CITIZENS' COUNCIL FOR CLEAN AIR, et al.; American Lung Association of Philadelphia and Montgomery County; Delchester Lung Association; Sierra Club, Pennsylvania Chapter; Friends of the Earth of the Delaware Valley; Citizens' Committee For Environmental Control; Quinn, Kevin; Farrell, Kaysi; Weiss, Ruth G.; Klinkner, John; Biez, Elizabeth S.; Shulman, Mona

v.

UNITED STATES of America

v.

COMMONWEALTH OF PENNSYLVANIA; the Pennsylvania Department of Transportation and William T. Sherlock, Secretary of the Pennsylvania Department of Transportation; the Pennsylvania Department of Environmental Resources and Maurice K. Goddard, Secretary of the Pennsylvania Department of Environmental Resources.

Appeal of COMMONWEALTH OF PENNSYLVANIA, et al.

No. 81–2303.

United States Court of Appeals, Third Circuit.

Argued Feb. 2, 1982.

Decided March 1, 1982.

Rehearing and Rehearing In Banc Denied March 26, 1982.

John M. Hrubovcak, Asst. Counsel, Dept. of Transportation, Com. of Pa., Harrisburg, Pa. (argued), for appellants.

Jerome Balter (argued), James S. Lanard, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for appellees Delaware Valley Citizens' Council for Clean Air, et al.

Carole E. Dinkins, Asst. Atty. Gen., Jacques B. Gelin, Maria A. Iizuka (argued), Attys., Appellate Section, Land and Natural Resources Divn., Dept. of Justice, Washington, D. C., for appellee United States of America.

Before GIBBONS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

On August 29, 1978, after two years of litigation over the Commonwealth of Pennsylvania's alleged failure to comply with the Clean Air Act of 1970, 42 U.S.C. §§ 7401 *et seq.*, the Commonwealth and its Departments of Transportation and Environmental Resources consented to a decree in federal court. The two other parties to the decree were the Delaware Valley Citizens' Council for Clean Air and the United States. The decree provided for the establishment and implementation of a program for the inspection and maintenance of automobile emissions systems (the "I/M program") with the aim of reducing the level of carbon monoxide and ozone pollution in the Philadelphia and Pittsburgh areas. In this appeal, the Commonwealth challenges three orders entered by the district court which relate to that decree.

The first order, entered May 20, 1981, denied a request by the Commonwealth for a 20-month extension of the deadline for implementation of the I/M program and declared the Commonwealth to be in violation of the consent decree. The second order, filed June 16, 1981, modified the consent decree to require monthly state audits of emissions inspection stations, the establishment of two official "referee" stations to handle consumer complaints, and the certification by the Commonwealth of at least

3,000 inspection stations by May 1, 1982. The third order, filed July 14, 1981, refused a Commonwealth request for reconsideration of the June 16 order.

We note at the outset that the Environmental Protection Agency's State Implementation Plan for Pennsylvania originally called for the implementation of an I/M program by May 1, 1975. 40 C.F.R. § 52.-2038(d)(6) (1981). That implementation date was subsequently extended by the consent decree and modifications of that decree, first to August 1, 1980, then to May 1, 1981, and ultimately to May 1, 1982. Thus, by the time the I/M program is to be implemented, on May 1, 1982, the program will already be *seven years* behind schedule.

Our scope of review on this appeal is narrow: whether, in its orders modifying and refusing to modify the consent decree, the district court abused its discretion. Because we find no abuse of discretion by the district court in this case, we will affirm each of the three orders in question.

I.

In April, 1973, the Pennsylvania Department of Environmental Resources submitted to the EPA, in accordance with the Clean Air Act, a proposed plan for meeting federal ambient air quality standards for carbon monoxide and ozone. As modified and promulgated by the EPA in November, 1973, this plan included a provision calling for the implementation of an I/M program by May 1, 1975. 40 C.F.R. § 52.2038 (1981).[1] The Commonwealth petitioned this court to review some aspects of the plan promulgated by the EPA, but did not seek review of the I/M requirement or of the May 1, 1975 date for implementation of the I/M program. *Commonwealth of Pa. v. EPA*, 500 F.2d 246 (3d Cir. 1974).

More than a year after the Commonwealth had been required to implement its I/M program, the Commonwealth had not yet undertaken to meet its obligation and the EPA, for its part, had not undertaken its mandatory duty to enforce the Commonwealth's obligation under the plan. Accordingly, on June 29, 1976, the Delaware Valley Citizens' Council for Clean Air instituted a citizens' lawsuit, under 42 U.S.C. § 7604, against the Commonwealth and the EPA. Subsequently, the EPA was dismissed as a defendant when it agreed to file its own complaint against the Commonwealth, and the two cases were consolidated.

Following prolonged discovery and negotiations the parties reached agreement on a consent decree which the district court approved on August 29, 1978. App. at 24. The consent decree called for the establishment and implementation of a program in which all gasoline-powered motor vehicles weighing 11,000 pounds or less registered in ten counties in the Philadelphia and Pittsburgh areas[2] would be inspected annually for excessive pollutants in their exhaust. Owners of vehicles failing the emission tests would be required to have maintenance performed on their vehicles to reduce their discharge of pollutants. Operation of vehicles which were not in compliance with the I/M program would be prohibited, with fines assessed for violations. The I/M program was designed to achieve a substantial reduction in hydrocarbon and carbon monoxide exhaust emissions by December 31, 1987. By that time, it was projected that the exhaust levels would be 25 percent less than they would have been without the program.

The consent decree provided that the Pennsylvania Department of Transportation would first seek legislation instituting

---

**1.** The Clean Air Act Amendments of 1977 subsequently established a requirement that states implement I/M programs in regional air basins where federal standards for either carbon monoxide or ozone could not be reached by December 31, 1982. 42 U.S.C. § 7502(b)(11)(B). The Philadelphia and Pittsburgh regions are in this category.

**2.** The affected counties are Philadelphia, Bucks, Chester, Delaware, and Montgomery Counties and Allegheny, Beaver, Butler, Washington, and Westmoreland Counties. Approximately 3.7 million vehicles would be subject to the I/M program. App. at 722.

a "franchise" I/M system.[3] If the Pennsylvania legislature failed to enact such legislation by July 1, 1979, the Department of Transportation was to promulgate regulations providing for a "private garage" I/M system.[4] Consent Decree, Aug. 29, 1978, ¶ 4; App. at 30. The deadline for the implementation of the private garage system—the date when mandatory annual inspection of vehicles would begin—was originally set at August 1, 1980. *Id.* Sched. B, ¶ 7; App. at 46.

When the legislature failed to pass enabling legislation for a "franchise system," the Department of Transportation embarked upon the process of implementing the I/M program through the certification of "private garages." Presumably, "private garages" would be induced to obtain certification by the prospect of charging motorists for performing inspections and for any necessary resulting repairs. Certification would be conducted in two stages. In Phase I, garages would be certified as having adequate space, lighting, and equipment. In Phase II, the garages would have to obtain approved emissions analyzing equipment and hire a certified emissions inspector.

In late 1979 the Commonwealth requested and obtained agreement from Delaware Valley and the EPA to modify the original consent decree so as to delay implementation of the I/M program until May 1, 1981. This modification was approved by the district court on March 7, 1980. App. at 54. On February 1, 1981, just three months before the I/M program was scheduled to be implemented under the then-existing consent decree, the Commonwealth had still not published final regulations covering the vehicle emissions analyzing equipment which private garages would have to procure in order to become certified inspection stations. On February 6, 1981 the Commonwealth requested Delaware Valley and the EPA to consent to another modification of the consent agreement so as to delay the start of the I/M program until January 1, 1983. The need for the 20-month delay was to permit the Commonwealth to require the use of "computerized analyzer" testing equipment. This type of equipment had been recommended by the EPA for decentralized inspection programs such as the Commonwealth's, since it offered greater accuracy and would therefore enhance public confidence in I/M programs. However, this computerized equipment had not yet been produced by any manufacturer, not even in prototype.

This request for modification was the subject of negotiations among the parties but the parties failed to reach agreement and negotiations came to an impasse on April 28, 1981. On April 29, 1981 the Commonwealth filed a motion with the district court for a modification of the existing consent decree which would delay the start-up of the I/M program from May 1, 1981 to January 1, 1983. On May 1, 1981, Delaware Valley filed a motion to have the court hold the Commonwealth in violation of the consent decree's requirement that the Commonwealth implement the I/M program by May 1, 1981.

Following a court conference on May 6, 1981, the EPA, at the court's request, submitted a brief report on the current air quality in the Philadelphia and Pittsburgh areas. The report demonstrated that, while air quality in the two regions was improving or presently adequate in respect to some

---

**3.** The consent decree defined the "franchise" system as

an inspection/maintenance program in which the Commonwealth enters into a contract with a single person or entity to establish and operate the inspection aspects of the program for a geographic area or areas under the general administration of the Commonwealth and whereby the Commonwealth may also certify fleet operators, and motor vehicle dealers, who own, lease or operate at least 15 subject vehicles, to conduct inspections of

subject vehicles owned, leased or operated by them.

Consent Decree, Aug. 29, 1978, ' 3(E); App. at 27–28.

**4.** The consent decree defined the "private garage" system as "an inspection/maintenance program in which the Commonwealth certifies a number of privately-owned facilities to perform the inspection of vehicles." *Id.* '. 3(D); App. at 27.

EPA standards, it continued to be inadequate in respect to other EPA standards. For example, the ozone level in the Pittsburgh area not only failed to meet the standard, but had become worse over the preceding two years. In the Philadelphia area, the ozone level, while decreasing, was still at nearly twice the concentration permitted by the EPA standard. *Id.* at 377. After receiving the EPA report, the district court issued its order of May 20, 1981 denying the Commonwealth's request for a modification of the consent decree which would extend the I/M program implementation date for another 20 months. The court also found the Commonwealth in violation of the existing decree in that the Commonwealth had not complied with the May 1, 1981 deadline for I/M program implementation as specified in the decree. *Id.* at 385.

The May 20 order also directed the Commonwealth to submit "a proposed plan for the Court's consideration, providing for the *immediate* implementation of the I/M program in accordance with the Consent Decree." *Id.* at 389. The Commonwealth submitted its proposed plan on June 1 and Delaware Valley submitted comments on the plan on June 8.

The court heard oral argument on June 10 with respect to the Commonwealth's proposed I/M plan. In an order dated June 16, 1981, the court approved the Commonwealth's I/M plan, along with certain amendments which had been suggested by Delaware Valley's comments. In the order the court extended the deadline for implementation of the I/M program from May 1, 1981 to May 1, 1982, because the latter date was the earliest date by which the Commonwealth could complete its regulatory process and provide for the production of a sufficient number of emission analyzers to implement the I/M program. The court also modified the consent decree to require monthly state audits of emissions inspection stations, establishment of two official "referee" stations to handle consumer complaints, and certification of at least 3,000 inspection stations by May 1, 1982. *Id.* at 533. A motion by the Commonwealth for reconsideration of the June 16 order was denied on July 14, 1981. *Id.* at 714.[5]

## II.

■ The authority of the district court to modify or refuse to modify the consent decree is defined in the decree itself. Paragraph 13 of the decree empowers the court, upon application by any party, to enter "such further orders and directions as may be necessary or appropriate for carrying out" the decree, or to modify or terminate any of the decree's provisions "upon a showing of changed circumstances and good cause."[6] This provision of the decree is merely declaratory of a district court's inherent power to modify a consent decree, even over the objection of one of the parties. *Jordan v. School Dist.*, 548 F.2d 117 (3d Cir. 1977). As Justice Cardozo wrote in *United States v. Swift & Co.*, 286 U.S. 106, 114-15, 52 S.Ct. 460, 462-463, 76 L.Ed. 999 (1932):

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent.... Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If

---

**5.** After the record in this case was closed, we were informed that the Pennsylvania legislature by statute had prohibited the expenditure of public funds for the establishment of an I/M program and that implementation of the program had ceased. The district court had thereupon, on January 22, 1982, held the Commonwealth in civil contempt. *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pa.*, 533 F.Supp. (E.D.Pa.1982). This aspect of the controversy is not before us.

**6.** Paragraph 13 of the consent decree provides:

> Jurisdiction is retained by this Court for the purpose of enabling any party to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for carrying out of this Consent Decree, for the modification or termination of any of the provisions herein upon a showing of changed circumstances and good cause, or for the enforcement of compliance therewith and the punishment of violations thereof. App. at 35.

the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.... The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.... The result is all one whether the decree has been entered after litigation or by consent.... We reject the argument ... that a decree entered upon consent is to be treated as a contract and not as a judicial act.... [I]n truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.

(Citations omitted.) *Accord, System Fed'n No. 91, Ry. Employes' Dep't, AFL CIO v. Wright,* 364 U.S. 642, 646 47, 81 S.Ct. 368, 370–371, 5 L.Ed.2d 349 (1961); *Jordan, supra,* 548 F.2d at 120-22.[7]

In attacking the district court's orders modifying and refusing to modify the consent decree, the Commonwealth presents two arguments. First, the Commonwealth argues that the district court's actions with respect to the decree were procedurally flawed because the court did not hold a full hearing on the parties' contentions and declined to hear testimony from various witnesses that the Commonwealth had produced. Second, the Commonwealth argues that the court's orders, substantively, were improper.

On the question of procedure, this court held in *Mayberry v. Maroney (I)*, 529 F.2d 332 (3d Cir. 1976), that a district court

must hold an evidentiary hearing before modifying a consent decree in such a manner as to remove requirements previously imposed. As Judge Gibbons wrote in his concurrence in *Mayberry I*, "Rule 60(b)(6) confers no standardless residual discretionary power to set aside judgments on mere second thought." *Id.* at 337 (Gibbons, J., concurring). To say that an evidentiary hearing must be held before a court decides to *modify* a consent decree does not, however, imply that such a hearing is required before a court *refuses* to modify a consent decree. A consent decree is, after all, a judgment and is entitled to a presumption of finality. *See Mayberry v. Maroney (II),* 558 F.2d 1159, 1163 (3d Cir. 1977). *Cf. Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950) ("There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from."). A court may thus be justified in rejecting, without affording an evidentiary hearing, a post-judgment attempt by a party to escape from obligations it had voluntarily assumed.

Neither is an evidentiary hearing required when a court modifies a consent decree in a substantive manner which is contemplated by the decree itself. Here, as discussed more fully below, the consent decree expressly provided for the possibility that the Commonwealth might have to conduct monthly audits of emissions inspection stations and might have to establish "referee" stations. In addition, the requirement that the Commonwealth make provision for some minimum number of stations to be certified, was necessarily implicit in the decree if the decree was to have any meaning or effect.

In this case, the Commonwealth's arguments were presented to the district court in various motion papers, at a conference held on May 6, 1981, and at a hearing on June 10, 1981. Given that, in its orders, the court did not increase the obligations to

7. In an analogous setting, Fed.R.Civ.P. 60(b) grants a district court discretionary authority to relieve a party from a judgment when "it is no longer equitable that the judgment should have prospective application," Rule 60(b)(5), or for "any other reason justifying relief from the operation of the judgment," Rule 60(b)(6).

which the Commonwealth had already agreed when it signed the then-existing decree, we are satisfied that the court did not err in the manner in which it conducted the motion proceedings.

### III.

With respect to the Commonwealth's challenges to the substance of the district court's orders at issue here, our scope of review is narrow. In reviewing the district court's orders, the issue is not whether the timetable or method of implementation sought by the Commonwealth was reasonable, or whether this court would have granted the Commonwealth's requests had the matter been initially before us. The issue, rather, is whether the district court properly exercised its discretion in deciding the matters presented to it.

### A.

*The District Court's Refusal to Extend the Compliance Deadline to January 1, 1983*

■ In the context of motions for relief from judgments under Rule 60(b),[8] this court has observed that

the standard for reopening a consent final judgment is a strict one. The Rule confers on district judges "[no] standardless residual discretionary power to set aside judgments . . . ." . . . Such relief is extraordinary and may be granted only upon a showing of exceptional circumstances. . . . We recognize, as well, that while consent decrees are judicial acts, they have often been recognized as having many of the attributes of a contract voluntarily undertaken. . . . And where, as here, the defendants made a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment their burden under Rule 60(b) is perhaps even more formidable than had they litigated and lost.

*Philadelphia Welfare Rights Org. v. Shapp,* 602 F.2d 1114, 1119–20 (3d Cir. 1979) (citations omitted), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). The party seeking a modification of a consent decree

must bear a heavy burden of showing circumstances so changed that "dangers, once substantial, have become attenuated to a shadow," *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), and that, absent such relief an "extreme" and "unexpected" hardship will result. *Id.* . . . [A] healthy respect for the finality of judgments demands no less.

*Mayberry II, supra,* 558 F.2d at 1163. *Accord, International Bhd. of Teamsters, Local 249 v. Western Pa. Motor Carriers Ass'n,* 660 F.2d 76, 85 (3d Cir. 1981); *United States Steel Corp. v. Fraternal Ass'n of Steel Haulers,* 601 F.2d 1269, 1274 (3d Cir. 1979).

The Commonwealth's April 29, 1981 motion to modify the consent decree was filed just two days before the I/M program had been scheduled to start under the then-existing decree. The sole reason advanced by the Commonwealth for seeking this modification was the Commonwealth's desire to specify computer analyzer emission testing equipment for its I/M program, instead of using the "BAR–80" analyzers then presently available.[9] In order to implement an I/M program with computer analyzers, the Commonwealth represented that an additional 20 months were needed because the desired computer analyzer testing equipment had not, as yet, been manufactured by any company, not even in prototype. The Commonwealth motion noted that an EPA policy statement of September 24, 1980 favored the use of computer analyzer testing equipment for decentralized I/M programs such as the program to be used in Pennsylvania.

---

**8.** The standard for denial of a motion to modify a consent decree is the same as the standard for denial of a Rule 60(b) motion. *International Bhd. of Teamsters, Local 249 v. Western Pa. Motor Carriers Ass'n,* 660 F.2d 76, 85 n.16 (3d Cir. 1981).

**9.** BAR–80 is the common designation for vehicle emission analyzers which meet the California Bureau of Automobile Repair 1980 specifications.

As previously observed, the district court, at a conference of the parties held on May 6, 1981, considered the Commonwealth's motions and requested an EPA report. After reviewing the report on May 20, the court denied the extension of time sought by the Commonwealth. The district court's opinion reveals that two factors underlay its decision not to grant the 20-month extension. First, as noted earlier, the EPA report had found that air quality in the Philadelphia and Pittsburgh areas continued to be substandard in some respects, and in one aspect had even gotten worse. At the time of the district court's order, the Commonwealth was already six years behind schedule in implementing the I/M program, and the court concluded that further delay would result in an undesirable postponement in attaining air quality standards. Although the Commonwealth argues that delaying implementation from May 1, 1982 (the date ultimately ordered by the court) to January 1, 1983 would have only a small impact on air quality, its own calculations indicate that the district court's decision not to delay implementation further would result in a lowering of pollutant levels at an earlier date than would occur under the Commonwealth's proposal.[10]

Second, although the computerized analyzer favored by the Commonwealth might present certain advantages, the district court concluded that further delay of the I/M program was not warranted given that the existing analyzers were adequate, that the computerized analyzers were $1,000 to $2,000 more costly for private garages to purchase than the BAR–80 analyzers,[11]

and—most important—that there was no assurance that on January 1, 1983 a sufficient number of computerized analyzers would be available. As the court noted:

> The new computer analyzer, which is more expensive, is not now available and, though presumably more accurate than the less expensive available analyzer, the degree of accuracy is neither necessary nor required by the [EPA]. All parties, including the EPA, agree that existing analyzers, which are less expensive for the inspecting gas stations to buy, are adequate to fulfill the needs of the I/M program.

App. at 386.

■ The Commonwealth has never represented that the computer analyzers it wishes to specify will be available to meet a January 1, 1983 implementation deadline. Thus, the Commonwealth's motion to modify the decree would have delayed the I/M program by 20 months without any assurance that the program could be instituted even at that time in the form proposed by the Commonwealth. In this light, although, as the United States argues in its brief, the extension of time sought by the Commonwealth was not unreasonable, we cannot say that the district court abused its discretion in denying the extension.

### B.

### The District Court's Declaration That the Commonwealth Had Violated the Consent Decree

The Commonwealth does not dispute the fact that on May 20, 1981, when the district

10. Although the Commonwealth's calculations indicate that the ozone concentrations in the Philadelphia and Pittsburgh areas on January 1, *1984* would not differ significantly regardless of whether the I/M program were implemented on May 1, 1982 or January 1, 1983, these same calculations indicate that compliance with the national ozone standard as of January 1, *1983* would be advanced by an earlier I/M deadline. For example, under the "Rollback Model" used by the Commonwealth, ozone levels in the Pittsburgh area on January 1, 1983 would be only 3% above the national standard of .12 ppm (parts per million) if the I/M program were implemented on May 1, 1982, but would be 13% above the standard if implementation

were delayed. (The figures generated by using the alternative "EKMA Model" would be 14% and 23%.) In the Philadelphia area, ozone levels would exceed the national standard by 13% if implementation occurred on May 1, 1982, but would exceed the standard by 19% if implementation were postponed by an additional eight months. (The corresponding figures under the EKMA Model would be 28% and 33%.) *See* Appellant's Brief at 24 (Table I).

11. *See* App. at 110. During oral argument the Commonwealth estimated the cost of a BAR–80 analyzer at $6,000. Tr. of Oral Argument at 24.

court found it in violation of the consent decree, it had failed to meet the May 1, 1981 deadline that then existed for the implementation of the I/M program. As of May 1, 1981 no inspection stations had been certified; indeed, none could have been because the Commonwealth had not yet published final regulations for the emissions analyzer equipment such stations would be required to use.

Despite this clear evidence of noncompliance with the consent decree, the Commonwealth contends that the district court should not have held it in violation of the decree because the Commonwealth had "diligently worked to modify the Consent Decree" and Delaware Valley had refused to consent to the Commonwealth's proposed modifications. Appellants' Brief at 30. As Delaware Valley noted in its brief, "Reduced to its essence, the Commonwealth argues that a defendant should ·be relieved of its liability under a judgment whenever the plaintiff refuses to modify the judgment." Delaware Valley Brief at 23.

The Commonwealth's argument is clearly untenable. While we do not pass on whether the Commonwealth acted in good faith in its response to the consent decree, it is obvious that a party to a binding judgment cannot comply with its terms by ignoring strictures placed upon it in the hope that they will disappear. As we stated in *Mayberry I, supra,* "The consent decree became the judgment of the court and the state officials were no more free to disregard its terms than are other litigants." 529 F.2d at 336 (citation omitted).

■ Had the Commonwealth sought both to comply in good faith with the decree and to employ the computerized analyzers, a request for modification of the decree could have been filed long before April 29, 1981. The record reveals that the Commonwealth knew *seven months* before the implementation deadline of May 1, 1981 that the EPA was recommending computerized analyzers and that the utilization of such equipment would require a postponement of the then-established I/M program implementation date. Furthermore, all plaintiffs had

placed the Commonwealth on notice early in February, 1981, that they would expect compliance with the decree unless further modifications were ordered. The plaintiffs were under no obligation to agree to the Commonwealth's proposed modification and the Commonwealth, for its part, was always entirely free to apply to the district court for a modification. It delayed doing so, however, until April 29, 1981, only two days before the implementation deadline imposed by the decree.

Although the district court stated that "the Commonwealth's delay in establishing the I/M program is disappointing and in large measure inexcusable," App. at 387, the court at that time denied Delaware Valley's request to set objective criteria by which to measure the Commonwealth's compliance with the decree and to provide for stipulated penalties. Thus, far from abusing its discretion in declaring the Commonwealth in violation of the decree, even though it found the Commonwealth to have violated its judgment the court adopted a deferential and restrained approach in declining to impose sanctions against the Commonwealth.

## C.

### *Requirement of Monthly Audits and "Referee" Stations*

In requiring monthly, rather than quarterly, audits of inspection stations, and the establishment of two official "referee" inspection stations instead of relying on consumer complaint investigations, the district court imposed requirements specifically provided for in the consent decree. Each of the requirements was meant as a fallback position in case less costly measures favored by the Commonwealth did not prove equally effective.

### 1.

With respect to audits of the private garages participating in the I/M program, the consent decree provided that the Commonwealth would develop

quality control procedures . . . , including periodic on-site visits by the Common-

wealth to inspection facilities, instrument calibration checks, and inspection of records. Periodic visits shall be unannounced and occur at least once every three (3) months for each inspection facility, unless the quality control procedures are modified pursuant to paragraphs 4, 6 and 8 of this schedule.

Modified Consent Decree, Mar. 7, 1980, Sched. B, ¶ 1(D); App. at 56. Paragraphs 4 and 6 of the decree provided that the Commonwealth would "[c]ommence [a] study to determine ... quality control procedures as effective as the results of monthly on-site visits by the Commonwealth to inspect facilities, check instrument calibrations and inspect records," ¶ 4; App. at 58, and to "[s]ubmit [the] study of quality control procedures, including recommendations and supporting data, to plaintiffs for review and comment," ¶ 6; App. at 59. In paragraph 8, the plaintiffs "reserve[d] the right to challenge any such procedures which are not as effective as the results of monthly on-site visits by the Commonwealth." App. at 59.

On September 23, 1980, the EPA issued a memorandum in which it rejected the Commonwealth's proposal to audit inspection stations on a quarterly basis. The EPA concluded:

Until [the Pennsylvania Department of Transportation] submits adequate information which shows that they have devised some other quality assurance program which is as effective as monthly audits, we feel that [the Department] must implement a system of monthly audits at all inspection stations.

In light of the EPA memorandum, Delaware Valley did challenge the Commonwealth's proposal for quarterly audits, pursuant to Schedule B, paragraph 8 of the consent decree, when Delaware Valley submitted its comments on the Commonwealth's June 1, 1981 proposal for implementation of the I/M program. *Id.* at 469.

The district court, noting that the EPA report had "outlined numerous defi-

ciencies and inadequacies of the proposed surveillance system" and that "EPA strongly recommended that the Commonwealth adopt a system of monthly audits, which in the opinion of the EPA would still remain cost-effective," concluded that "the proposed quarterly visitation program would not be 'as effective as the results of monthly visits.'" *Id.* at 536. The court thus required the Commonwealth to institute monthly audits of the private garages participating in the I/M program. In view of Schedule B, paragraph 8 of the decree, which left open the possibility that monthly audits would be required if the Commonwealth's alternative procedures were "not as effective as the results of monthly on-site visits," and the EPA report indicating the deficiencies of the Commonwealth's proposal, the district court's action was not an abuse of discretion.

### 2.

With respect to the establishment of "referee" stations,[12] Schedule B, paragraph 9 of the consent decree required the Commonwealth to adopt

policies for providing, as a consumer protection mechanism, facilities where official confirming inspections may be conducted independent of certified private garages (i.e., at least one facility in the Philadelphia area and one facility in the Pittsburgh area as the base system, with operation of other facilities at the sole discretion of [the Pennsylvania Department of Transportation]), or an equally effective alternative, such as timely consumer compl[ai]nt investigations by Commonwealth employees. These employees would return to the inspection station in question with the complainant to verify the inspection procedures, to verify the calibration of the analyzer and to supervise the retest of the vehicle in question.

*Id.* at 60. After considering Delaware Valley's objection that the Commonwealth's consumer complaint proposal would be inadequate, the district court concluded:

the event a dispute arose with the private garage as to the inspection results.

---

12. The purpose of "referee" stations was to provide a neutral state-run testing facility in

[C]ommon sense dictates that the Commonwealth's proposed Central Complaint Office procedure would not rise to the level of "an equally effective alternative" as that of at least one official confirming inspection station in both the Philadelphia and Pittsburgh areas, as described in Sch. B, ¶ 9 of the modified Consent Decree.

*Id.* at 537.

As the district court observed in its opinion, the establishment of "referee" stations was "the originally envisioned mode" of ensuring the accuracy of the inspections performed by the private garages. *Id.* at 538. Alternative procedures were permissible only if they were "equally effective." The district court concluded that the alternative proposed by the Commonwealth would not be equally as effective as the establishment of "referee" stations. We hold that the court did not abuse its discretion in thereby requiring that "referee" stations be established.

### D.

### *Certification of 3,000 Stations*

The district court, in its June 16, 1981 order, required the Commonwealth to certify at least 3,000 inspection stations by May 1, 1982. The Commonwealth argues that this was an abuse of discretion because there was no such requirement in the consent decree and because the Commonwealth had no way of ensuring compliance with the requirement since it has no power or authority to mandate that private garages purchase the emissions analyzers and hire the inspectors necessary to obtain Phase II certification.

At oral argument, the Commonwealth indicated that its objection was not to the *number* of stations mandated—indeed, the Commonwealth itself had contemplated the establishment of 8,700 stations, nearly three times the number required by the district court [13]—but to the fact that the court required the certification of *any* stations. The Commonwealth's position was that it would have been an abuse of discretion for the court to have mandated the certification of even *one* station. Tr. of Oral Argument at 8. In the Commonwealth's view, the consent decree did not require it to establish a network of inspection stations, but merely to set up a system which private stations could volunteer to join. *Id.* at 14. And if too few stations, or even no stations, chose to participate, then—in an argument reminiscent of its earlier apology for noncompliance with the May 1, 1981 implementation deadline—the Commonwealth would treat the decree as inoperative and seek to modify it. *Id.* at 13, 18–19, 21–22, 43.

We reject this argument in its entirety. The Commonwealth in effect is asserting that the consent decree into which it entered imposed *no* real obligation on it to ensure that vehicle inspections took place and that pollutant emissions were reduced.[14] We agree with Delaware Valley

---

13. *See* App. at 559.

14. As the Commonwealth stated at oral argument:

> MR. HRUBOVCAK: ... [N]o stations have been certified through Phase 2 or purchased the required piece of equipment.
>
> THE COURT: Well, now, let's assume that none ever do and you come back to Judge Bechtle and ask for a modification of the decree.
>
> What will the Commonwealth's position be? Will it be that the decree finds them to do something about the problem or that, well, this settlement failed; let's try the lawsuit?
>
> MR. HRUBOVCAK: Well, Your Honor, I really can't speculate as—
>
> THE COURT: I have to speculate.

> MR. HRUBOVCAK: Okay. The basis for your speculation is that no stations have applied for a Phase 2 certification; and, therefore, no cars can be inspected at the required date; is that the ground rules, Your Honor?
>
> THE COURT: Yes. What happens then? Does the decree bind the Commonwealth to do anything at all?
>
> MR. HRUBOVCAK: No, Your Honor. *The decree, as I read it, would not bind the Commonwealth at all.* That might be—
>
> THE COURT: That leaves the case in the posture then that the plaintiffs would say, "All right. If the Commonwealth isn't bound, let's go back and try the lawsuit."
>
> MR. HRUBOVCAK: That will be one possibility.
>
> THE COURT: Yes.
>
> MR. HRUBOVCAK: Your Honor—

that "[s]uch an argument would make a mockery of the Consent Decree and would work a cruel hoax on the court." Delaware Valley Brief at 31.

Although the requirement that a certain number of inspection stations be certified is not explicitly set forth in the decree, it is necessarily implicit in it. To hold otherwise would turn the decree into an empty promise. When it signed the decree, the Commonwealth must have known that the attainment of the decree's objectives would require a certain minimum number of inspection stations to be established, and that it was the Commonwealth's duty under the decree to see that this was done. *See Mayberry I, supra,* 529 F.2d at 337 (Gibbons, J., concurring). We are unwilling to believe that the Commonwealth negotiated and signed the decree, regarding it from the start as a meaningless document, a farce.

It is true that the Commonwealth cannot force privately-owned garages to participate in the I/M program, but this argument is basically a distraction. It was always contemplated that the I/M program would be structured such that there would be an economic incentive for private garages to participate. In fact, at the time of the court's order, some 2,274 garages had already applied for the program, and had achieved Phase I certification. App. at 535.

We have no reason to believe that if the Commonwealth set about implementing the I/M program in good faith, the goal of 3,000 certified stations could not be met. But even if the number of initially volunteering garages fell short of the number necessary to operate the I/M program adequately, this would not be grounds—as the Commonwealth seems to suggest—for scrapping the decree. The Commonwealth always retains the option to establish its own inspection stations if a shortage of inspection facilities develops. We thus hold that the district court did not abuse its discretion in requiring the Commonwealth to certify 3,000 inspection stations by May 1, 1982.

> THE COURT: And that is not a very attractive construction of a final judgment that's been in place for a number of years.

## IV.

In short, the Commonwealth agreed to establish an I/M program and obligated itself to achieve particular goals by particular dates. We are not persuaded that its commitment, judicially decreed since August 29, 1978, was illusory. Accordingly, since we have concluded that the district court properly exercised its discretion, the orders appealed from will be affirmed.

Tr. of Oral Argument at 21 22 (emphasis added).