**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**STATE OF MICHIGAN, James J. Blanchard, Governor of the State of Michigan, the Michigan Corrections Commission, Gwen Andrew, Chairman, Michigan Corrections Commission, Thomas Eardley, Dwayne Waters, Don P. Leduc, Members, Michigan Corrections Commission, Michigan Department of Corrections, Perry Johnson, Director, Michigan Department of Corrections, Robert Brown, Jr., Deputy Director, Michigan Department of Corrections, Dale Foltz, Regional Administrator, State Prison of Southern Michigan, John Jabe, Warden, Michigan Reformatory, Theodore Koehler, Warden, Mar-**quette Branch Prison, John Prelesnik, Administrator, Reception and Guidance Center, State Prison of Southern Michigan, and Jack Bergman, Administrator, Michigan Intensive Programming Center, Defendants–Appellants.

**Nos. 90–1366, 90–1367 and 90–1537.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 19, 1990.

Decided July 2, 1991.

**144**

William L. Fette, American Civil Liberties Fund of Michigan, Kalamazoo, Mich., Elizabeth R. Alexander (argued), Chief Staff Counsel, National Prison Project, Washington, D.C., Patricia A. Streeter, Detroit, Mich., for appellees.

Patricia L. Blake, Detroit, Mich., Susan Przekop–Shaw (argued), Office of Atty. Gen., Corrections Div., Lansing, Mich., David K. Flynn, Marie K. McElderry, John R. Dunne, Susan D. Carle (argued), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, D.C., Arthur E. Peabody, Jr., Chief, William Bradford Reynolds, Asst. Atty. Gen., U.S. Dept. of Justice, Special Litigation Section, John A. Smietanka, U.S. Atty., Office of the U.S. Atty., Grand Rapids, Mich., for U.S.

Michael Barnhart, Patricia A. Streeter, Barnhart & Mirer, Detroit, Mich., for amicus curiae Hadix, et al.

Richard M.C. Adams, Asst. Atty. Gen., Susan Przekop–Shaw (argued), Corrections Div., Donald S. McGehee, Office of the Atty. Gen., Tort Defense Div., Thomas C. Nelson, Asst. Atty. Gen., Office of the Atty. Gen., Habeas Div., Lansing, Mich., for defendants-appellants.

Before KRUPANSKY and BOGGS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

The five orders of the United States District Court for the Western District of Michigan dated November 3, 1989, November 6, 1989, two on January 24, 1990, and April 4, 1990, presently under appellate review, had their common genesis in the ongoing implementation of a consent decree approved by the court on July 16, 1984 resolving a case initiated by the plaintiff-appellee United States of America (United States) against the defendants-appellants State of Michigan, *et al.* (Michigan), pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997 *et seq.*

In the first order, issued on November 3, 1989 the district court rejected Michigan's proposed inmate classification plan, including its validation of compliance procedures, dated June 3, 1988, and directed the state to submit, by not later than April 2, 1990, a revised professionally-based classification plan that incorporated court-substituted

compliance procedures. The court-dictated compliance procedures detailed the content, nature, and extent of the plan that would satisfy the requirements of the July 16, 1984 consent decree. On November 6, 1989, the district court also mandated the development of "a plan [by Michigan] illustrating how they plan to manage the correctional population projected by their research division." *United States v. Michigan,* No. G84–63 CA at 3 (W.D.Mich. Nov. 6, 1989) (order) [hereinafter Nov. 6 Order]. Michigan moved for reconsideration of the November 3 and 6 decisions, which the district court denied in an order issued on January 24, 1990. The district court declared the two orders "final orders for the purposes of appeal." *United States v. Michigan,* No. G84–63 CA at 5 (W.D.Mich. Jan. 24, 1989) (order denying motion to modify or set aside Nov. 3 and 6 orders) [hereinafter Jan. 24 Order Denying Motion to Modify]. All three orders were timely appealed by Michigan and assigned case number 90–1366 for appellate review.

Also on January 24, 1990, in a separate, concurrent order, the district court amplified and extended its two previous orders entered on November 3 and 6, 1989 by directing an annual projection of the state's prison population to the year 2000 to be "developed by an *independent contractor, and not by the Department of Corrections or by employees of the State of Michigan.... The contractor ... and the scope of service* must be approved by the Court *following notice to the plaintiff and amici." United States v. Michigan,* No. G84–63 CA at 30–31 (W.D.Mich. Jan. 24, 1990) (contempt order) [hereinafter Jan. 24 Contempt Order]. In the same entry, the district court adjudged Michigan in contempt of two previous orders dated March 31, 1988 and September 28, 1988. This decision was appealed on February 22, 1990 and was assigned appellate number 90–1367.

The fifth judgment on appeal was issued April 4, 1990. To further support the validation procedure addressed by its order of January 24, 1990, in conjunction with its findings of contempt, the trial court modified the consent decree and state plan of July 16, 1984 by mandating the disclosure of privileged medical/mental health/dental care internal peer audits in lieu of summaries thereof. That related appeal was designated as case number 90–1537.

On June 29, 1990, this court granted a temporary stay of execution of the orders dated November 3 and 6, 1989, and January 24, 1990, which stay, following a hearing on July 27, 1990, was continued pending further order. On September 7, 1990, this court granted a temporary stay of execution of the April 4, 1990 order.[1] Because of their common origins in the July 16, 1984 consent decree, the five orders were consolidated into one appeal. Oral arguments were entertained by this court on September 19, 1990.

For purposes of orientation, the evolution of this proceeding may be briefly summarized by an overview of the events that gave rise to this case. In January of 1984, the United States filed a complaint against Michigan pursuant to CRIPA, 42 U.S.C. § 1997,[2] in which it alleged that Michigan

---

**1.** The appellate history of this case discloses an egregious dissipation of the appellate judicial resource induced by escalating personality conflicts, mutual distrusts, and suspicions, which have, to date, generated ten appeals involving three panels and eight judges of this court. Three additional petitions for review have yet to be scheduled for oral arguments. This calculation excludes three decisions from the United States District Court for the Eastern District of Michigan in *Hadix v. Johnson,* in which essentially identical factual and constitutional issues are being litigated. *See* note 3.

**2.** CRIPA provides, in pertinent part:

Whenever the Attorney General has reasonable cause to believe that any State ... is subjecting persons residing in or confined to an institution, as defined in section 1997 of this title, to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm, and that such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities, the Attorney General, *for or in the name of the United States,* may institute a civil action ... for such equitable relief as may be appropriate to insure *the minimum*

violated the eighth and fourteenth amendments to the United States Constitution by perpetuating conditions and practices which constituted cruel and unusual punishment at the State Prison of Southern Michigan (including the Reception and Guidance Center), the Michigan Reformatory, and the Marquette Branch Prison (including the Michigan Intensive Programming Center) (collectively "the subject prisons") in the following manner:

18. The subject prisons fail to provide and maintain basic elements of a *safe and sanitary physical and environmental plant* (including fire safety) for the inmates.

19. The subject prisons fail to *provide medical services (including services for suicidal, psychotic, and self-mutilating inmates)* minimally necessary to meet the inmates' serious needs, where the failure to provide such care manifests a deliberate indifference to these needs.

20. The subject prisons fail *to protect inmates from harm*, including harm from increased *violence and serious threats to health associated with overcrowding.*

Complaint at 5, *United States v. Michigan,* No. G84–63 CA (W.D.Mich. filed Jan. 18, 1984) (emphasis added).

The United States also charged that Michigan had violated the guarantees of the first, sixth, and fourteenth amendments to the United States Constitution by depriving inmates access to the courts in that the subject prisons (1) failed to provide inmates access by mail to their attorneys, to courts, and to government officials, and (2) failed to provide inmates sufficient access to law library resources and/or legal assistance. The United States petitioned for preliminary and permanent injunctive relief.

On January 18, 1984, contemporaneously with the filing of the complaint, the United States moved the trial court to enter a judgment memorializing an agreement and a plan of implementation between it and Michigan that, to the *full satisfaction* of the United States, corrected the *totality of the conditions* which anchored its constitutional infringement charges.

On February 24, 1984, prior to the hearing on the consent decree, the National Prison Project of the American Civil Liberties Union (NPP–ACLU) and the American Civil Liberties Union Foundation of Michigan (ACLUFM) requested leave to "intervene" as "litigating amici curiae" with the full litigating rights of a named party to the controversy. On March 23, 1984, before the entry of the consent decree, the district court denied the motions of the NPP–ACLU and the ACLUFM for "litigating status," and the motion of the *"Hadix* class" of prisoners for intervention pursuant to Fed.R.Civ.P. 24,[3] but permitted their appearance in the traditional role of amici to address, by brief and oral argument, the proposed consent decree. *United States v. Michigan,* 680 F.Supp. 928, 935–43 (W.D. Mich.1987) (order granting amicus curiae status). The court also ordered the real parties in interest, the United States and Michigan, to redraft their agreement to

corrective measures necessary to ensure the full enjoyment of such rights, privileges, or immunities, except that such equitable relief shall be available under this subchapter to persons residing in or confined to an institution as defined in section 1997(1)(B)(ii) of this title only insofar as such persons are subjected to conditions which deprive them of rights, privileges, or immunities secured or protected by the Constitution of the United States.
42 U.S.C. § 1997a(a) (emphasis added). Section 1997 defines "institution" as, *inter alia,* "a jail, prison, or other correctional facility" that is "is owned, operated, or managed by, or provides services on behalf of any State." 42 U.S.C. § 1997(1).
CRIPA also requires that prior to filing an action pursuant to section 1997a(a), the Attor-

ney General must notify the state against whom the action will be initiated, detailing the perceived constitutional violations and *the minimum* measures that the Attorney General deems necessary to remedy the alleged conditions. 42 U.S.C. § 1997b(a)(1). The Attorney General must also aid the target state in locating federal funds that may be available to help defray the costs of remedial measures and must make an effort to correct the alleged conditions informally. 42 U.S.C. § 1997b(a)(2).

3. The *"Hadix* class" prisoners were plaintiffs in *Hadix v. Johnson,* Civ. No. 80–73501 (E.D. Mich.), a section 1983 class action that addressed conditions similar to those addressed by the case at bar.

conform with various court suggestions as a condition to endorsing and adopting the consent decree as its judgment. *Id.* at 945–49 (order rejecting proposed consent decree). A hearing on the revised agreement was scheduled for June 22, 1984.

Early in June 1984, the NPP–ACLU and the ACLUFM filed a 42 U.S.C. § 1983 class action styled *Knop v. Johnson,* Civ. No. G84–651–CA5 (W.D.Mich.) that challenged many of the same conditions of confinement in Michigan prisons as those already challenged by the United States in the instant case. *See Knop v. Johnson,* 667 F.Supp. 467 (W.D.Mich.1987). Sometime subsequent to initiating its class action, the *Knop* class, with the approval of the district court, replaced the NPP–ACLU and the ACLUFM as amicus curiae in the instant case and became the surrogate of both special interest groups, which remained as its legal counsel. The *Knop* class thereafter filed formal motions to intervene pursuant to Fed.R.Civ.P. 24 as a real party in interest in the instant case, as did the plaintiffs in a similar section 1983 action, *Jansson v. Johnson,* Civ. No. 84–1263 DT (E.D.Mich.). On June 22, 1984, the district court denied the motions, concluding that the *Knop* class and the *Jansson* plaintiffs did not and could not qualify as intervenors of right or as permissive intervenors pursuant to Fed.R.Civ.P. 24. *United States v. Michigan,* 680 F.Supp. at 950–53 (order denying intervention). That decision was not appealed and remains the law of the case.

On March 31, 1986, the *Knop* class again requested to intervene as "litigating amicus curiae" with the full litigating rights of a named party in the case. The court, in an opinion and order entered August 28, 1987, granted the *Knop* class motion. Accordingly, after previously denying the same status to the NPP–ACLU and the ACLUFM and after denying intervention by the *Knop* class, the court indirectly conferred upon the *Knop* class as "litigating amicus curiae" all of the participating rights of a named party in interest to the instant controversy, including the right to file pleadings, to compel discovery, to initiate contempt proceedings, to formulate and

join issues, to issue and enforce subpoenas, to compel attendance at compliance hearings, and to file motions to modify and amend the consent decree between the named parties in interest. After receiving "litigating amicus curiae" status, the *Knop* class dismissed its separate section 1983 action. Michigan appealed the order granting "litigating status" to the *Knop* amicus, but this court refused to address the merits of the appeal by concluding that the order granting "litigating amicus curiae" status to the *Knop* class was not a final appealable order. *United States v. Michigan,* No. 88–1869, 1990 WL 46637 (6th Cir. April 20, 1990) (unpublished).

On July 16, 1984, the district court entered its judgment, which embraced the court-mandated, revised agreement and state plan between the United States and Michigan. In deference to defined Supreme Court precedent, the United States in its complaint and petition for relief, the State of Michigan in executing the consent agreement, and the trial court in accepting the consent agreement addressed only those physical conditions of confinement that rose to the level of constitutional prohibitions against cruel and unusual punishment by resulting "in unquestioned and serious deprivation of *basic human needs*" or by depriving "inmates of the *minimal* civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (emphasis added). Thus, consistent with existing legal precedent, the parameters of the trial court's July 16, 1984 consent decree embraced only the following physical conditions of confinement:

1. Medical and Mental Health Care
2. Fire Safety
3. Sanitation Safety and Hygiene
4. Crowding and Protection from Harm
5. Access to Courts and Legal Mail.

Integral to the effective correction of the alleged constitutional infringements identified in the judgment of July 16, 1984 was the design and development of a professionally-based and professionally-administered plan for entry-level screening and

classification of inmates, and the subsequent reclassification of inmates for assignment to appropriate prisoner profile categories. However, professional correctional practices characterized by the trial court and its independent expert as "programming needs," such as vocational guidance, job assignments, educational counseling, limited work hours, recreational activities, sociological counseling, forced inmate idleness, available educational opportunities, and similar sociologically oriented programs that did not "involve the unnecessary and wanton infliction of pain," *Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)), were not addressed in the consent decree.

The consent decree required Michigan to "design and implement a professionally based classification plan ... by June 30 of 1988." Consent Decree at 6, *United States v. Michigan*, No. G84–63 CA (W.D.Mich. entered July 16, 1984). Pursuant to the consent decree, Michigan submitted a classification proposal to assign inmates to an institution consistent with their respective classification designations as early as July 21, 1986. The trial court ordered that plan to be implemented by 1989. However, for reasons not clarified by the record, Michigan submitted a replacement proposal on June 3, 1988. In essence, this plan defined its security classifications as follows:

| NEW | OLD |
| --- | --- |
| Level I | minimum |
| Level II | medium |
| Level III | medium |
| Level IV | close |
| Level V | maximum |
| Level VI | (no previous equivalent) |

Although inmates retained an assigned permanent classification, they could, nevertheless, be temporarily classified in "segregation" or "community status." Under the proposed plan, inmates were to be classified immediately upon entry. Assigned classifications were to be reviewed at least annually or upon request initiated pursuant to a prescribed procedure.

Classification was predicated upon two scales. The first scale reflected the prisoner's "confinement" level, defined as the "level of physical restraint determined necessary to reduce escape risk." The second scale reflected the prisoner's "management" level, defined as the "level of physical restraint necessary to maintain good institutional order and to protect prisoners and staff from harm." A prisoner's "security" level or "true security classification" was the level of control and custody determined by the higher of the confinement and management levels. For example, a prisoner with a confinement level of IV and a management level of III would be assigned security classification level IV. "Wherever possible," a prisoner would be "placed at a facility of the security level indicated as his/her true security level." However, the proposal recognized that "[t]here may be reasons unrelated to security, such as medical needs or lack of bed space of the appropriate level, which preclude such placement." Reasons for placement inconsistent with the prisoner's true security level classification were to be entered in the prisoner's file. Michigan also assigned a security level to each of its prison facilities throughout the state. Certain facilities included several physically separated areas of confinement with differing security classifications.

Michigan had not incorporated programming classifications or "program needs" into its proposal, which it asserted were intentionally excluded from the July 16, 1984 consent decree, because prisoner program needs were already being professionally accommodated and such sociological activities did not spring from constitutional requirements.

The United States and amicus curiae entered objections to Michigan's June 3, 1988 proposals and charged, among other things, that:

1. entry level screening evaluations and classification assignments failed to accurately reflect inmate security risk propensities;

2. only 50 percent of housing placements coincided with assigned classifications;

3. an unusually high 80 percent of entry level inmates were initially assigned to the two lowest security risk levels resulting in an inordinately high number of prisoners later being reassigned to higher security levels, which purportedly indicated that a significant number of dangerous prisoners were being commingled and confined with less dangerous inmates; and

4. the proposal failed to couple "program needs" defined as socio-rehabilitation considerations with security and medical criteria in class evaluations and assignments.

On November 3, 1989, subsequent to a hearing conducted on the previous day, the trial court concluded that Michigan's June 3, 1988 plan did not comply with the consent judgment of July 16, 1984 because (1) the defendants had "not 'designed and implemented a professionally-based classification system' as required by the Decree," (2) the disputed term "implementation" meant "that the classification plan must be operated so as to have force and effect on the actual operation of correctional facilities, programs, staff, and prisoners," *United States v. Michigan*, No. G84–63 CA at 1–2 (W.D.Mich. Nov. 3, 1989) (order) [hereinafter Nov. 3 Order],[4] and (3) the scope of the required classification plan "corresponds with the scope of the Decree itself." Jan. 24 Order Denying Motion to Modify at 5.

In rejecting Michigan's proposed classification plan, the court observed that, as a result of improperly implementing its classification instrument dated June 3, 1986, there was an "excessive disparity between the designated classification (according to the classification system) and actual placement (the classification level of the facility to which the prisoner is actually assigned). This renders the classification almost meaningless." Nov. 3 Order at 3. The court also observed that the state's proposal was severely limited in scope to addressing only inmate medical, mental, safety, and security criteria and ignored prisoner sociological "program needs," which the United States, the court's independent expert, and amicus insisted were a necessary and integral part of any classification system. Finally, the trial court prescribed, in *detail*, the nature, scope, and extent of the compliance validating procedure that the state would be required to incorporate into a revised classification plan to be submitted on or before April 2, 1990.

In an interrelated order issued November 6, 1989, the district court noted that Michigan had failed to address a projected shortfall of 16,000 cell spaces by 1992. Thus, the district court ordered Michigan to evolve a plan "to manage the [projected] correctional population." Nov. 6 Order at 3.

Michigan moved for reconsideration of the trial court's orders, arguing that the court materially modified the July 14, 1984 consent decree by:

1. ordering relief that exceeded the parameters of the consent decree without finding further constitutional violations;

2. ordering implementation of overly intrusive remedies;

3. expanding the scope of the consent decree to embrace the entire correctional system of the State of Michigan; and

4. expanding the consent decree to include sociological programming characterized as "program needs" which did not rise to the level of eighth amendment infringements and which were intentionally excluded from the consent decree.

On January 24, the trial court, treating the motion for reconsideration as a motion to modify or set aside, affirmed its orders of November 3 and 6, 1989. *See* Jan. 24 Or-

---

**4.** On November 3, 1989, the district court entered both an opinion and an order implementing the terms of the opinion. The district court, the parties, and amicus have consistently referred only to the "order" entered on November 3, although actually referring to the terms of the "opinion." This court, therefore, as a convenience, will continue the practice.

der Denying Motion to Modify. The district court acknowledged that the two orders were final, appealable injunctive orders: "Thus, my orders of November 3 and November 6 now become final orders for the purposes of appeal...." *Id.* at 2.

In a separate order issued on the same day, the district court addressed a motion filed by amicus, but without support from the United States, seeking sanctions for contempt against the governor, attorney general, the Michigan Department of Corrections, and others.[5] However, after several hearings, the court adjudged only the Michigan Department of Corrections in contempt (1) for failing to submit a revised mental health program statement based on prison population projections to the year 2000, and (2) for failing to report that the Marquette Branch Prison had discontinued general library services. Jan. 24 Contempt Order at 15–23.

■ This appeal arises from various orders that are indisputably modifications of the consent decree, which are injunctive in nature, to which appellate jurisdiction attaches by congressional decree. 28 U.S.C. § 1292(a)(1);[6] *United States v. Michigan,* No. 88–1869, slip op. at 7–8 (6th Cir. April 20, 1990) (unpublished). *See Musto v. American General Corp.,* 861 F.2d 897, 914 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Bradley v. Milliken,* 772 F.2d 266, 270–71 (6th Cir.1985). *See also United States v. Wheeling–Pittsburgh Steel Corp.,* 818 F.2d 1077, 1082 (3d Cir.1987); *King v. Ionization Int'l, Inc.,* 825 F.2d 1180, 1184–85 (7th Cir.1987); *Ohntrup v. Firearms Center, Inc.,* 802 F.2d 676 (3d Cir.1986) (per curiam); *Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114 (3d Cir.1979), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *Gary W. v. State of Louisiana,* 601 F.2d 240, 243–44 (5th Cir.1979); *Mayberry*

*v. Maroney,* 558 F.2d 1159 (3d Cir.1977); *In re Grand Jury Proceedings (U.S. Steel–Clairton Works),* 525 F.2d 151, 154–56 (3d Cir.1975).

Supreme Court jurisprudence, as well as the pronouncements of this court, firmly supports the principal that this court has appellate jurisdiction over the modifications of the consent decree. The Supreme Court, in a case involving pretrial injunctions, has stated that the policy behind 28 U.S.C. § 1292(a)(1) was to "permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." *Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981) (quoting *Baltimore Contractors, Inc. v. Bodinger,* 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1957)). As demonstrated, courts have traditionally considered the modification of a consent decree to be serious, leading to "perhaps irreparable" consequences. "A consent decree has attributes of both a contract and a judicial act." *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983). As a contract, a decree does not have a purpose, but reflects a compromise or agreement negotiated *between parties* who each have a purpose. *See United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). "Judicial approval of a settlement agreement places the power and prestige of the court *behind the compromise struck by the parties."* *Williams,* 720 F.2d at 920 (emphasis added). The standard for justifying the modification of a consent decree is a *strict* one and "a consent decree is, after all, a judgment and entitled to a presumption of finality." *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 674 F.2d 976, 980–81 (3d Cir.), *cert. denied,* 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982).

Amicus's argument, citing to *Groseclose v. Dutton,* 788 F.2d 356 (6th Cir.1986), that

---

**5.** The *Knop* amicus not only sought findings in contempt, but also attorney fees and costs in the amount of $60,575.18.

**6.** Section 1292(a)(1) provides, in part:
(a) [C]ourts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of district courts ... or the judges thereof, ... granting, continuing, *modifying,* refusing or dissolving *injunctions* ....
28 U.S.C. § 1292(a)(1).

the November 3, 1989 order to design and implement a revised professionally-based classification plan and validating procedure was not a final appealable order is misconceived. Assuming, arguendo, the correctness of amicus curiae's position, it should be noted that the orders of November 3 and November 6, 1989, the two separate orders dated January 24, 1990, as well as the decision of April 4, 1990, had their common origin in the July 16, 1984 consent decree and incorporated state plan.

Read *in pari materia*, the district court's orders dated November 3, 1989, November 6, 1989, and January 24, 1990 mandated, in detail, the content, nature, and scope of the validating procedures that Michigan was to implement in performing its future compliance audits to satisfy its commitments in the July 16, 1984 consent decree. A comparison of Michigan's June 3, 1988 professionally-based classification plan and validating procedures with the court's prescribed classification plan and monitoring procedures, which were mandated to be incorporated into Michigan's revised classification plan, disclosed that they joined legal issues that could be decided without further factual elaboration.

Thus, they were immediately reviewable upon appeal even though the appeal was from an entry of a preliminary injunction. Any future action that could have been taken by the district court would not have changed or affected the legal issues presented in this appeal. Accordingly, appellate review of the injunctive orders of the district court dated November 3, 1989, November 6, 1989, and January 24, 1990 would not be premature. *Groseclose*, 788 F.2d at 359–60; *Liddell v. Board of Educ. of St. Louis*, 693 F.2d 721 (8th Cir.1981); *Spates v. Manson*, 619 F.2d 204 (2d Cir. 1980); *Hoots v. Commonwealth of Pennsylvania*, 587 F.2d 1340 (3d Cir.1978); *Frederick L. v. Thomas*, 557 F.2d 373 (3d Cir.1977); *Taylor v. Board of Educ.*, 288 F.2d 600 (2d Cir.1961).

Although the district court's January 24, 1990 contempt citation and its April 4, 1990 order modifying the consent decree by mandating the disclosure of privileged medical/mental health/dental care internal peer audits are independently appealable final orders to this court, as more fully hereinafter addressed, because of their common genesis with the November 3, 1989, November 6, 1989 and January 24, 1990 orders in the seminal July 16, 1984 consent decree, and because they are inextricably entangled with the November 3, 1989 and November 6, 1989 orders, they may also be umbrellaed under the appeal from those decisions which otherwise invoked the appellate jurisdiction of this court:

[A]s the[] cases indicate, if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction. The Court of Appeals in this case properly recognized and applied these principles when it observed:

"Thus, although this appeal arises from a ruling on a request for a preliminary injunction, we have before us an unusually complete factual and legal presentation from which to address the important constitutional issues at stake. The customary discretion accorded to a District Court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law."

*Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 757, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986) (footnotes omitted) (quoting *American College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d 283, 290 (3d Cir.1984)).

This court has also recognized the scope of appellate jurisdiction over issues involving injunctive relief:

It is elementary that an appeal from the denial of injunctive relief brings the whole record before the appellate court and that the "scope of review may extend further [than the immediate question on which the District Court ruled] to allow disposition of all matters appropri-

ately raised by the record, including entry of final judgment." 16 Wright & Miller *Federal Practice* § 3921 (1977). We have "jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the Court of Appeals without further trial court development." *Ibid.* This principle is supported by numerous precedents and by policy considerations. *See, e.g., Hurwitz v. Directors Guild of America, Inc.,* 364 F.2d 67, 69–70 (2d Cir.1966), and the cases cited in Wright & Miller *supra,* § [3921].

*Brown & Williamson Tobacco Corp. v. FTC,* 717 F.2d 963, 964 (6th Cir.1983) (order denying petition for rehearing en banc).

In particular, when litigation involves a remedial plan, revisions to the plan, and efforts to enforce compliance, an assessment of the afforded injunctive relief will, of necessity, require plenary review of the entire record:

> Although an order requiring a party to litigation to submit a proposed remedial plan is not itself an injunctive order appealable under 28 U.S.C.A. § 1292(a)(1), where an order issued by a district court also incorporates injunctive measures which are properly appealable under § 1292(a)(1), the court of appeals has jurisdiction to review the entire order of the district court including the requirement that a defendant submit a remedial plan.
>
> \* \* \* \* \* \*
>
> ... Because the district court did award injunctive relief in the order from which the appellants perfected an appeal, this court's jurisdiction has been properly invoked to consider all issues joined in that order, including the mandate that the appellants submit a remedial plan
>
> ....

*Newsom v. Norris,* 888 F.2d 371, 380 (6th Cir.1989) (citing *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865–66, 96 L.Ed. 1153 (1952); *Highland Avenue & Belt R.R. Co. v. Columbian Equipment Co.,* 168 U.S. 627, 630, 18 S.Ct. 240, 241, 42 L.Ed. 605 (1898); *Smith v. Vulcan Iron Works,* 165 U.S. 518, 525, 17 S.Ct. 407, 41 L.Ed. 810 (1897); *Kohn v.*

*American Metal Climax, Inc.,* 458 F.2d 255, 262 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *Allstate Ins. Co. v. McNeill,* 382 F.2d 84, 87 (4th Cir.1967), *cert. denied,* 392 U.S. 931, 88 S.Ct. 2290, 20 L.Ed.2d 1390 (1968); *McNally v. Pulitzer Publ. Co.,* 532 F.2d 69 (8th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976); *Sierra Club v. Marsh,* 816 F.2d 1376, 1382 (9th Cir.1987); *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant,* 760 F.2d 312, 315 (D.C.Cir.1985); *King Instrument Corp. v. Otari Corp.,* 814 F.2d 1560, 1562 (Fed.Cir. 1987)).

Because, in the instant case, the district court did award injunctive relief in the interrelated orders of November 3, 1989, November 6, 1989, and January 24, 1990, from which appellants perfected timely appeals, this court's jurisdiction has been properly invoked to review and consider the entire record, including all related issues having a common nexus with issues joined in those appeals. Those related issues include the citations for contempt and the mandate to disclose privileged medical/mental health/dental care internal draft peer audits.

The eighth amendment limitations on conditions of penal confinement, imposed upon the states through the fourteenth amendment, do not join issues of first impression. The Supreme Court turned its attention and consideration to that area over twenty years ago and, among its more current teachings, summarized its unwavering convictions:

> Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra,* [428 U.S.] at 173, 96 S.Ct., at 2925, or are grossly disproportionate to the severity of the crime, *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Among "unnecessary and wanton" inflictions of pain are those that are "totally without penologi-

cal justification." *Gregg v. Georgia, supra,* 428 U.S., at 183, 96 S.Ct., at 2929; *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

\* \* \* \* \* \*

... But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

\* \* \* \* \* \*

... [T]he Constitution does not mandate comfortable prisons, and prisons ... which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court.

*Chapman,* 452 U.S. at 346–47, 349, 101 S.Ct. at 2399–2400 (footnote omitted).

In *Bell v. Wolfish,* the court elaborated on the limits placed by the Constitution on conditions of confinement:

[O]ur cases also have insisted on a second proposition: simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the consideration underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948); *see Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S. [119], at 125, 97 S.Ct. [2532], at 2538 [53 L.Ed.2d 629 (1977)]; *Wolff v. McDonnell, supra,* 418 U.S. [539], at 555, 94 S.Ct. [2963], at 2974 [41 L.Ed.2d 935 (1974)]; *Pell v. Procunier, supra,* 417 U.S. [817], at 822, 94 S.Ct. [2800], at 2804 [41 L.Ed.2d 495 (1974)]. The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. *Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S., at 125, 97 S.Ct., at 2538; *Pell v. Procunier, supra,* 417 U.S., at 822, 94

S.Ct., at 2804. There must be a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell, supra,* 418 U.S., at 556, 94 S.Ct., at 2975. This principle applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual.

*Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979). The Court has consistently declared that, even under circumstances when valid institutional security restrictions infringe upon constitutional guarantees, the latter must give way to the former in the interests of safeguarding institutional security:

[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier, supra,* 417 U.S., at 823, 94 S.Ct., at 2804; *see Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S., at 129, 97 S.Ct., at 2540; *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974). Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S., at 129, 97 S.Ct., at 2540; *Pell v. Procunier, supra,* 417 U.S., at 822, 826, 94 S.Ct., at 2804, 2806; *Procunier v. Martinez, supra,* 416 U.S., at 412–414, 94 S.Ct., at 1810–1812.

*Id.* 441 U.S. at 546–47, 99 S.Ct. at 1878 (footnote omitted).

Having identified the boundaries that the eighth amendment has imposed upon the conditions of prisoner detention, the Court later admonished lower courts as to the standards of judicial discretion to be exercised in assessing the validity of inmate-asserted eighth amendment infringements:

No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 [630] (1958) (plurality opinion). The Court has held, however, that "Eighth Amendment judgments should neither be *nor appear* to be merely the *subjective views*" of judges. *Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980). To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. *Coker v. Georgia, supra,* 433 U.S., at 597, 97 S.Ct., at 2868 (plurality opinion); *Gregg v. Georgia, supra,* 428 U.S., at 182, 96 S.Ct., at 2929 (joint opinion). But such "'judgment[s] should be *informed by objective factors to the maximum possible extent.'*" *Rummel v. Estelle, supra,* 445 U.S., at 274–275, 100 S.Ct., at 1139, quoting *Coker v. Georgia, supra,* at 592, 97 S.Ct., at 2866 (plurality opinion).

*Chapman,* 452 U.S. at 346, 101 S.Ct. at 2399 (emphasis added).[7]

Perhaps the most perceptive of the Court's cautionary observations, which, incidentally, addresses the prevailing undercurrent of the case at bar, was incorporated in the following caveat to the judiciary:

"Courts must be mindful that these inquiries spring from *constitutional requirements* and that *judicial* answers to them must reflect that fact rather than a *court's idea of how best to operate* a detention facility." *Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874 (emphasis added). The court amplified this caveat with a compelling rationale:

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S., at 128, 97 S.Ct., at 2539; *Procunier v. Martinez, supra,* 416 U.S., at 404–405, 94 S.Ct., at 1807–1808; *Cruz v. Beto, supra,* 405 U.S. [319], at 321, 92 S.Ct. [1079], at 1081 [31 L.Ed.2d 263 (1972) ]; *see Meachum v. Fano,* 427 U.S. [215], at 228–229, 96 S.Ct. [2532] at 2540–2541, 49 L.Ed.2d 451 (1976) ]. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, *in the absence of substantial evidence in the record* to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S., at 827, 94 S.Ct., at 2806. We further observe that, on occasion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, *but*

---

**7.** This court notes the recent decision of the Supreme Court in *Wilson v. Seiter,* No. 89–7376, —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 1991 U.S. LEXIS 3490 (June 17, 1991), which has not only reaffirmed the principle that eighth amendment impingements anchored in conditions of confinement must be objectively demonstrated, *id.* at —— ——, 111 S.Ct. at 2326–27 but also has announced that the plaintiff has the burden of proving that prison authorities subjectively intended such violations. *Id.* at —— ——, 111 S.Ct. at 2326–27. It is noted, however, that the subjective intentions of prison authorities must be demonstrated by objective manifestations of such intent, and cannot be proved by factually unsupported, conclusory opinions of the court or of the prisoners or their representatives.

*also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. Procunier v. Martinez, supra,* 416 U.S., at 405, 94 S.Ct., at 1807; cf. *Meachum v. Fano, supra,* 427 U.S., at 229, 96 S.Ct., at 2540. With these teachings of our cases in mind, we turn to an examination of the ... security practices that are alleged to violate the Constitution.

*Wolfish,* 441 U.S. at 547–48, 99 S.Ct. at 1878–79 (1979) (footnotes omitted) (emphasis added).

The unabridged teachings of the Court convey the Court's own unequivocal commitment to and its adamant recognition of the state's sovereign authority to operate its penal institutions. Anchored in the sensitive principles of federalism, this sovereign authority is a prerogative of the state, not a privilege recognized through comity.

Apart from the Supreme Court's limitations imposed upon lower courts in eighth amendment prisoner detention cases, the parameters of consideration in the instant case have been further confined by the consent decree executed by the United States and Michigan, dated July 16, 1984, and adopted by the district court as its judgment.

The complaint by the United States charged Michigan with constitutional infringements arising from physical conditions of confinement in "fail[ing] to provide and maintain basic elements of a safe and sanitary physical and environmental plant (including fire safety) for inmates," failing "to provide medical services (including services for suicidal, psychotic, and self-mutilating inmates)," and failing "to protect inmates from harm" at the named institutions here in controversy. Complaint at 5. Michigan denied the allegations and the issues were never adjudicated. Consequently, the record fails to disclose the existence, scope, or degree, if any, of the asserted constitutional infringements. The controversy was resolved by a consent decree, including a state plan of implementation which was limited in application to the

named facilities. The consent decree, as approved by the trial court, was intended to be "in resolution of *all claims asserted and relief sought,* and *without a finding of liability or other determination on the merits.*" Consent Decree at 2.

In *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), the Supreme Court directed courts of lesser jurisdiction to interpret the scope of consent decrees disposing of institutional litigation with the following cautionary instruction: "[T]he 'scope of a consent decree *must* be discerned *within its four* corners, *and not by reference to what might satisfy the purposes of one of the parties to it'* or by what *'might* have been written *had the plaintiff established his factual claims and legal theories in litigation.'*" *Id.* at 574, 104 S.Ct. at 2585 (emphasis added) (quoting *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)).

■ Courts, nevertheless, retain the authority to modify consent decrees upon affirmative proof of a defect or deficiency in an original decree which impedes achieving the objectives of the decree because experience has proved the provisions of the decree to be less effective than anticipated or because circumstances and conditions have changed which warrant modifications, provided that the ordered modifications further the purpose of the original decree without upsetting the core intent, purpose, and scope of the basic agreement between the parties. *Heath v. De Courcy,* 888 F.2d 1105, 1108–09 (6th Cir.1989). Moreover, any modification must be fashioned to achieve the goals of the enabling legislation, in this case CRIPA, and must be tailored to address conditions giving rise to a constitutional infringement. *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982); *Park View Heights Corp. v. City of Black Jack,* 605 F.2d 1033, 1036, 1040 (8th Cir. 1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980).

Having revisited prevailing Supreme Court precedent, which has charted the course for this court in resolving the issues of the instant appellate review, and having

juxtaposed the consent decree dated July 16, 1984 and the state's proposed professionally-based classification plan of June 3, 1988 with the court's material extensions and modifications of those proposals as mandated by its five orders here in controversy, this court finds it appropriate to address the controversial issues more precisely.[8]

It is apparent from the agreement that Michigan committed itself to fund a multimillion dollar expenditure to restructure, realign, and upgrade the physical conditions of inmate detention at the subject prisons. Michigan's obligations included programs of new construction, rehabilitation of existing structures, professional medical and psychiatric recruitment, and extensive recruitment and training of nonprofessional, technical, and other supporting personnel, together with a reassessment of existing practices and procedures at the subject prisons. The agreement, as approved by the trial court, essentially tracked the allegations of the complaint and was limited in its scope to the following physical conditions of confinement:

1. Medical care
2. Fire safety
3. Sanitation, safety and hygiene
4. Crowding and protection from harm
5. Access to the courts.

Of the above five areas identified in the consent decree as the sources of alleged inmate constitutional infringements, the instant appeals implicate only the conditions numbered 1, 4, and 5: Michigan's failure to adequately project the needs for mental health facilities; Michigan's alleged failure to develop and effectively implement a pro-

fessionally-based classification plan designed to protect prisoners from harm; and Michigan's failure to report the closure of a library at one of its facilities.

The record reflects that Michigan's proposed inmate classification plan, submitted on June 3, 1988, as subsequently revised to incorporate various recommendations suggested by plaintiff's experts, was professionally designed and developed by William L. Kime and endorsed by Robert A. Buchanan II, both recognized expert consultants on penal classification systems. The plan was essentially modeled after systems that had been adopted and successfully implemented by other state correction authorities as well as the Federal Bureau of Prisons. The primary objection of amicus and the United States to Michigan's proposed plan was lodged in the charge that inmates were not actually placed or housed in accordance with their individually developed classification profiles and that Michigan's plan was limited to security considerations and ignored inmate "program needs."

In its decisions, the trial court was primarily concerned with Michigan's implementation of the proposed classification instrument, as is reflected by the court's remarks:

> There is excessive disparity between designated classification (according to the classification system) and actual placement (the classification level of the facility to which the prisoner is actually assigned). This renders classification almost meaningless.

Nov. 3 Order at 3.

The Court finds that the term "implementation" means that the classification

**8.** This court has been handicapped in considering and disposing of individual findings and conclusions incorporated into the various decrees here under review. It has been difficult to precisely correlate the injunctions addressing the consent decree requirement to design and develop a professionally-based classification plan with the testimony of United States and amicus experts. This is due, in part, to a failure by the parties and the trial court to adopt a common terminology in discussing the various classification plans proffered by the parties and the district court, and because of various conflicting statements by the district court.

It would appear from the expert testimony that the classification plan is composed of three

components. The "classification instrument" identifies various security level categories and defines the criteria to be applied in assigning inmates to a security level that differentiates probabilities of misconduct. Thus, by determining the inmates' security-level profile, the classification instrument indicates where the inmates *should* be housed or assigned. "Implementation" of the classification instrument is a function of coordinating the *actual placement* of inmates into available physical facilities. "Validation" of the classification instrument and its implementation is the methodology designed to evaluate their operational effectiveness: the degree and manner of the state's compliance with the demands of the classification instrument.

plan must be operated so as to have force and effect on the actual operation of correctional facilities, programs, staff, and prisoners. Thus, it will not be sufficient to merely label prisoners if the actions warranted by the labels are not carried out.

*Id.* at 2. It is apparent from the record that the trial court's assessment was well-taken and that the percentage of "overrides" of designated security classifications have been excessive.[9] This conclusion was not seriously rejected by Michigan, although it did contest the degree of excessive "override" percentages alleged by amicus and the plaintiff.

In any event, the trial court's concerns are endorsed by this court. Although there is no absolute consensus between the six-odd experts who addressed the issue of an acceptable fixed percentage of "overrides" in designated security classifications, a range of between 10 percent and 20 percent received favorable comment from the participating penological experts. It appears that the overrides have been more a function of implementation than of the composition of Michigan's security classification instrument. Waivers of designated classifications apparently have resulted from the lack of available appropriate housing facilities combined with a practice of convenience in "waiving" inmates into a lower classified facility.

■ This court concludes that, although Michigan's proposed security classification instrument is professionally-based and designed to track essentially the same configurations that have been adopted and successfully administered by other states and the Federal Bureau of Prisons, and although the record reflects no evidence that Michigan has deliberately attempted to avoid its commitments under the consent decree and the June 3, 1988 proposed classification plan by initially assigning prisoners to less effective quarters, Michigan's implementation of that plan leaves much to be desired.

Accordingly, Michigan shall *meaningfully* implement the security classification plan filed on June 3, 1988 by actually placing individual inmates in accordance with their classification profiles, recognizing that misplacements due to temporary unavailability of appropriate space does not necessarily require a change in classification designation or the system itself. Upon remand, the trial court shall direct Michigan and the United States to structure a *reasonable* time frame within which Michigan *shall* bring the overrides into an acceptable range of 20 percent. Defendants and the United States *shall* effectively monitor the progress of their efforts with periodic reports to be submitted by the defendants at agreed upon intervals disclosing the level of overrides in the system and assessing those levels in relation to a general norm of 20 percent or less.

In considering the district court's order directing the defendants to incorporate inmate "program needs" into its classification system, this court's attention is directed to the Supreme Court's pronouncements that have recognized and addressed the relationship between "program needs"— such as vocational, educational, recreational, guidance, and other similar sociological programs—and eighth amendment infringements. In characterizing those aids as desirable, the Court has emphasized that a failure to incorporate programming needs into a classification system does not inflict pain, much less unnecessary and wanton pain. Consequently, such failure does not rise to the level of an eighth amendment violation:

[J]ob and educational opportunities[, more particularly] *limited work hours*

9. As closely as can be determined from the record, "overrides" encompass two distinct concepts. A "departure," an integral part of the security classification system, involves a discretionary professional judgment to adjust the objectively factored security level to improve an inmate's classification. A "waiver," however, essentially ignores the inmate's true classification and results in a placement in accordance with available resources. Waivers, consequently, indicate a resource availability rather than a classification defect. A Michigan Security Classification Audit of May 1988 disclosed a 15.5 percent actual or a 23.1 percent effective "departure" override and a 42.3 percent actual or a 54.7 percent effective "waiver" override.

*and delay before receiving education do not inflict pain, much less unnecessary and wanton pain;* deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution.

*Chapman,* 452 U.S. at 348, 101 S.Ct. at 2400 (emphasis added). Moreover, the record reflects that security classifications were and are separate and distinct procedures in Michigan's penal system.

Although an incidental connection was recognized during the negotiation of the consent decree between security levels and some programming classifications in that a limited number of programs were unavailable at particular security levels, programming classification was excluded from the consent decree. Michigan, prior to the execution of the consent decree, had already been implementing an existing programming classification within its penal system. Moreover, a review of the consent decree fails to support any intention of the parties to include a programming classification in either the consent decree or the state plan of implementation. There is no affirmative evidence to support an eighth amendment constitutional basis for extending the consent decree as implemented by the state plan and the security classification instrument dated June 3, 1988 to include programming classification. Thus, the district court-ordered modifications of those instruments to incorporate programming needs as mandated by its various orders here in controversy, including, but not limited to, part I, sections 4, 20, 21, 22, and 23 [10] of the

November 3, 1990 order, are RE-VERSED.[11]

This court has also conducted an analysis of Michigan's proposed validation procedures, designed to monitor compliance with the classification instrument, and the court-adopted work product of amicus, the United States, and the independent expert. This court concludes that both validation plans are equally effective and comparable in that both procedures generate essentially the same information necessary to adequately evaluate Michigan's compliance efforts. Recognizing the wide diversity of expert opinion available within any given professional peer group to convincingly support an almost unlimited spectrum of desired predicates, one of which may be more appealing to a judicial evaluator than another, when the proposals are comparably equal, as they are here, a court should defer to the expertise of the prison's administrators.

There is no affirmative evidence disclosed in the record before this court that reflects a defect or deficiency of substance in the consent decree, the state plan, or the June 3, 1988 classification plan and its validation procedures that would impede the objectives of the consent decree. There is no affirmative evidence that Michigan's classification and validation proposals are inadequate or would contribute to the potential for violence or pose a threat to the safety of inmates, nor is there affirmative proof that the provisions of the consent decree would be less effective than initially anticipated by the real parties in interest and the court or that conditions had changed to such a degree as to warrant the material modifications and extensions man-

---

**10.** Sections 20, 21, and 23 of part I may be implemented to the extent that they permit, pursuant to the consent decree, the provision of minimally acceptable medical (including mental health) care and to protect persons from self-inflicted harm or harm to others, but not for purposes of classifying prisoners for "program needs" as that term is used in this opinion.

**11.** This does not affect Michigan's obligations to provide programming where it has separately so agreed pursuant to the state plan—*e.g.,* State Plan § IV(J)(6)—unless Michigan has been otherwise relieved from such obligations by the

district court. Nor does this affect any prior court order requiring provision of specific programming where Michigan failed to appeal the order, or an order that has previously been affirmed by this court. But, those separately contracted obligations do not affect the scope or content of the security classification plan that is required by section D(1) of the consent decree. The consent decree is otherwise confined in scope by the limited purpose of CRIPA to enforce *constitutional* rights and the Supreme Court's narrow definition of those rights as they relate to "conditions of confinement."

dated by the district court. It would appear from the record that the trial court has permitted itself to become inextricably entangled in details of prison administration best left to the judgment of the sovereign State of Michigan.

Moreover, the district court extended the classification plan to prison facilities statewide, in derogation of the consent decree, which, by agreement of the parties, limited the application of the classification plan to the named institutions. Conditions have not changed to such an extent that the trial court could look outside the four corners of the consent degree in determining the obligations of the parties. In addition, the record reveals no affirmative factual proof of constitutional violations to support this material extension and modification of the consent decree. Under the circumstances of this case, it is for Michigan to decide the feasibility of extending the professionally-based classification plan beyond the prisons named in the consent decree to prison facilities statewide.

The dispositive issues considered by this court are summarized with clarity by the Supreme Court in its discussion of the sensitive area of state sovereignty that may be impacted by judicially-imposed federal penal reform:

There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this complex arena. The deplorable conditions and Draconian restrictions of some of our Nation's prisons are too well known to require recounting here, and the federal courts rightly have condemned these sordid aspects of our prison systems. But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are

actually charged with and trained in the running of the particular institution under examination. But under the Constitution, *the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan.* This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the *inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the* Constitution or, in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements *are confided to officials outside of the Judicial Branch of Government.*

*Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886 (emphasis added).

The Court went on to counsel: "Concern with minutiae of prison administration can only district the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?" *Id.* at 544, 99 S.Ct. at 1877.

The June 3, 1988 professionally-based classification plan and attendant validating techniques were and are at least comparable to the imposed methodology mandated by the November 3, 1989 district court order, as well as subsequent orders that address the issue of a professionally-based classification plan. The district court abused its discretion in overly intruding upon the sovereignty of Michigan and the terms and conditions of the consent decree by materially extending and modifying the consent decree as it relates to affected prison facilities. Thus, the district court's orders, to the extent that they modified or extended Michigan's submitted classification plan, including any requirements to justify, explain, or further validate the classification instrument, and including all requirements that the plan encompass a statewide system of classification, including, but not necessarily limited to, the first full paragraph of page 10, the first full

paragraph of page 11, the first full paragraph of page 12, the first sentence of the second paragraph on page 12, all of section 4 on pages 13 and 14, and all of section 6, on page 15 of the November 3, 1989 opinion are REVERSED.

■ Although the protracted interim litigation has interrupted a fine-tuned evaluation of its validation efforts, Michigan has committed to conduct ongoing studies, assessments, and reassignments of both the classification instrument and its validation criteria to insure the effectiveness of its overall classification plan. This court concludes from the record that Michigan's proposed validating procedures are equal and comparable to those evolved by amicus and the United States as adopted by the court. Both proposals generate essentially the same data. Accordingly, this court follows the dictates of the Supreme Court in this area of penal administration, which requires the lower courts to avoid intrusion, either directly or indirectly through special masters, independent experts, or other extraneous participants, into the realm of "expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the [state] legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Thus, this court concludes that Michigan should be permitted to continue developing its implementation of the professionally-based classification instrument and validation procedures until it appears from affirmative proof that the plan and procedures result in a constitutional infringement.

Recognizing that, according to the United States Bureau of Prisons, the constantly fluctuating number of arrests and the dynamics of prosecution policies, sentencing, and parole decisions all directly influence prison populations, and, consequently, make it extremely difficult to project, with any degree of accuracy, extended future prison populations, their management, and facility requirements, this court, nevertheless, AFFIRMS that part of the district court's orders of November 6, 1989 and January 24, 1990 directing Michigan to "develop ... a plan illustrating how they plan to manage the correctional population projected by their research." Issued pursuant to section K of the consent decree, the district court's orders require nothing more than a noncommittal forecast illustrating how Michigan intended to cope with controlling overcrowding, with placing prisoners in accordance with their profile classifications, and with providing adequate capacity for inmate mental health care.

The district court's first judgment of contempt against Michigan was conceived in its September 29, 1988 order directing Michigan to submit a revised program statement for a new mental health facility designed to provide acute and comprehensive mental health care for a population projected to at least the year 2000. Michigan responded by presenting a program that addressed the future needs of an inmate population through at least the year 1990. The program was to be implemented by a 400–bed facility readily expandable to a capacity of 500 beds if additional requirements demanded. A review of the record prompts this court to AFFIRM the district court's adjudication of contempt.

Accordingly, Michigan shall provide a population projection as mandated by the district court order of September 29, 1988 within a reasonable time frame to be determined by the United States and Michigan as approved by the court. The program shall also conform to the district court's directives incorporated in its order of January 24, 1990 in (1) the first sentence of the last paragraph on page 31; and (2) paragraphs 1 and 2 on page 32.

This court further concludes that Michigan is capable of developing the mandated projections without the assistance of an outside independent contractor. The district court's order to the contrary is an overly intrusive directive and an abuse of discretion. The requirement that Michigan retain an independent contractor to develop the projection is, therefore, REVERSED.

Michigan has acknowledged its error in removing from the March 1989 final audit report information disclosing the discontin-

ued library services at Marquette Branch Prison, information that it initially included in its draft audits. Initially, this court notes that the evidence of record fails to disclose any bad faith or intentional effort to withhold information by Barbara Hladki, the consent decree coordinator, or by the Department of Corrections. Considering the compliance provisions of the consent decree that demand the monitoring of literally hundreds of conditions at the subject prisons, which house over 7500 prisoners, coupled with the virtually free access Michigan has accorded amicus and the United States, including their respective representatives and experts, to the various facilities and to the volume of documents, surveys, and reports generated by the Department of Corrections, the significance of a single oversight, misinterpretation, or misjudgment concerning a condition as obvious as discontinuing library services at Marquette is of little, or no, substantial consequence. The adjudication of contempt for this insignificant infraction constituted an abuse of discretion and is REVERSED.

In ordering its related injunction to restructure the compliance reporting procedures, presently conducted by the consent decree coordinator, the district court found "it impossible to reconcile the defendants' new assertive and aggressive litigating posture, with the defendants' obligation to report the facts of compliance with the degree of candor and particularity required by ... paragraph L of the Consent Decree." Jan. 24 Contempt Order at 8. The compliance procedures were, by the conditions of the consent decree, reserved exclusively to Michigan, and the district court's restructuring order appears to be anchored, not in the record, but rather in displeasure arising from Michigan's reluctance to passively submit to a series of recently evolving decisions including the trial court's decision to confer litigating rights equal to those of a named party/real

party in interest upon the *Knop* class under the appellation of "litigating amicus curiae," and Michigan's aggressive opposition to litigating amicus's efforts to exercise those litigating rights by initiating contempt proceedings, without the support of the United States, charging the governor, the attorney general, and other state officials with nonfeasance and misfeasance. Moreover, the record failed to disclose that the existing compliance reporting procedures were defective or deficient in achieving the objectives of the consent decree or that circumstances and conditions had changed since the entry of the consent judgment to warrant the court-ordered restructuring.

Perhaps the most convincing argument advanced by Michigan against the district court's restructuring was that the order preempted the state's sovereign domain over employment, tables of administrative organization, personnel assignments, and reporting responsibilities. Under the court's order, the appointment of the consent decree coordinator would be subject to approval by the amicus, the United States, and the court. In addition, the order directed the coordinator to withhold initial examination and review of all compliance reports developed by the decree coordinator and staff members from the Michigan Department of Corrections, its employees, the executive branch of state government, and its legal counsel, the state attorney general, until those documents were released to the United States and amici. The district court having abused its discretion, its overly intrusive sanction is accordingly REVERSED in its entirety.

Michigan's final assignment of error challenges the district court's order of April 4, 1990, which, like the district court's orders of November 3, 1989, November 6, 1989, and January 24, 1990, has its common origin in the consent decree and incorporated state plan dated July 16, 1984.[12] In

---

**12.** The methodology for reporting medical, mental health, and dental audits was an issue extensively negotiated between the United States and Michigan. The procedure, intended to accommodate and incorporate the dictates of Mich.Comp.Laws §§ 333.20175(6) and 333.-

21515 with the state plan, was agreed upon by the United States and the *Knop* amicus and was approved by the court. The relevant statutes provide:

(6) The records, data, and knowledge collected for or by individuals or committees as-

**162**

signed a professional review function in a health facility or agency are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena.

Mich.Comp.Laws § 333.20175(6) (Supp.1991) (formerly § 333.20175(5) (1980)).

The records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena.

Mich.Comp.Laws § 333.21515 (1980).

The pertinent language in the state plan specified only summaries of the findings of each audit:

Consistent with principles of peer review confidentiality, a professional report *shall summarize* the findings of each audit including an enumeration of any condition inconsistent with contemporary professional health care standards.

State Plan of Compliance at 24. (App. A of Consent Decree).

To totally disregard the precise condition of the agreement between the parties by materially restructuring the reporting procedure to require disclosure of the actual internal peer review audits for medical/mental health/dental care in lieu of summaries was a material modification of magnitude of the terms of the agreement between the named parties to this case in controversy.

Here again, a review of the record fails to disclose any factual support for the magistrate's order of March 16, 1990, as affirmed by the district court on April 4, 1990. The reasoning advanced by the district court on April 4, 1990 to justify its modification of the consent decree, implying, without factual support, a bad faith effort on behalf of Michigan to evade its responsibilities to accurately summarize its internal medical/mental health/dental care peer review audits is less than convincing when considered within the context of its previous complimentary comments addressing the integrity and professionalism of those same summaries thirty-nine days earlier in its January 24, 1990 order wherein it attested:

The Court has been impressed with the medical and mental health audits required under Section II.M of the State Plan for Compliance. These audits were conducted by departmental staff along with independent professionals who are not employees of the department. The Court believes that the application of this concept to the other areas of the Consent Decree would do much to strengthen the fact-finding process.

Jan. 24 Contempt Order at 8.

Justification for the court's radical revision of the consent order by requiring the disclosure of internal peer review audits in lieu of summaries was the *speculation* that the internal audits *might* contain relevant information that could *possibly* discredit Michigan's integrity in accurately summarizing the internal medical/mental health/dental care audits, citing to the district court's adjudication of contempt arising from Michigan's inadvertent failure to report the discontinuation of library services at Marquette, which order has now been reversed. In any event, an inaccuracy in another unrelated audit generated by a totally foreign procedure is not imputable to the integrity of the medical/mental health/dental care summarized versions of the internal draft audits of those services. Unfortunately, modification of the consent decree, compelling the submission of privileged draft internal audit reports in lieu of summaries, has been, like a number of the issues joined in these appeals, considered and decided by the district court in the abstract, rather than upon actual factual proof of existing predicate constitutional infringement, contrary to the admonitions of the Supreme Court.

Mindful of the district court's earlier expressed confidence in the accuracy, all inclusive scope, and reliability of the summarized internal audits, based upon an experience factor of approximately five years, a conclusion endorsed by the district court's independent expert, and in the absence of proof of bad faith by Michigan to knowingly suppress or omit material facts and information in an effort to intentionally distort the summarized internal medical/mental health/dental care draft audits; in the absence of proof of a defect or deficiency in the district court's original decree approving the consent agreement that impeded achieving the objectives of the original decree, either because experience proved the provisions of the original decree to be less effective than anticipated or circumstances and conditions had changed to warrant modification; and in the absence of proof that the modification was tailored to address conditions giving rise to a constitutional infringement, this court concludes that the April 4, 1990 order is overly intrusive. This conclusion is reinforced by the record, which disclosed that the court-ordered modification is in derogation of the intent, scope, and purpose of the July 14, 1984 consent decree in that compliance commands Michigan to violate its own statutes and to destroy the statutory privilege designed to protect the confidentiality integral to any peer review and evaluation of the medical/mental health/dental care peer audits thereby eviscerating the objectivity, integrity, and reliability of those audits, which, in turn, serve to materially erode accuracy, objectivity, integrity, and reliability of the summarized audits prepared to track Michigan's compliance with the consent decree. The record also reflects that the wide range of freedom accorded to the independent expert, the *Knop* and *Hadix* amici, the United States, their attorneys, and their experts to tour and inspect the various prisons, to review virtually all prison administration documents and generated reports, and to interview inmates affords a broad collateral information source to verify the accuracy, integrity, and reliability of the summarized internal draft audits without

addressing this issue, Michigan initially challenged the standing of the *Knop* class as "litigating amicus curiae" to compel the disclosure of confidential internal draft medical/mental health/dental care peer audits and its right to exercise the litigating rights of a real party in interest.

■ As discussed earlier, the *"Knop* plaintiffs," inmates in the subject prisons, were denied the right to intervene in this action. However, the district court permitted them to participate in the traditional role of amicus curiae. In July 1984, Michigan and the United States entered into a consent decree and extended the traditional role of amicus curiae to the extent that the defendants were to furnish amicus curiae with reports, plans, pleadings, memoranda, and other documents submitted to the United States and the court pursuant to paragraphs I, J, K, and L of the consent decree. The United States was also to furnish amicus with its responses, if any. The consent decree also permitted the *Knop* class to respond to any of those materials and to exercise, within the discretion of the trial court, its traditional privileges of participating in any hearing conducted by the court by brief and oral argument.

In July, 1988, after several years of compliance litigation, chronicled in part in *United States v. Michigan,* 680 F.Supp. 928 (W.D.Mich.1987), and *Knop v. Johnson,* 700 F.Supp. 1457 (W.D.Mich.1988), and over the objections of the United States and Michigan, the district court conferred "litigating amicus curiae" status upon the *Knop* class. The *Knop* class subsequently dismissed its pending, parallel civil rights action. This change of status expanded the *Knop* plaintiffs' role in this action beyond that specified in the consent decree. As ordered by the court, the *Knop* class as "litigating amicus curiae" was extended full litigating rights of a named party to the action including, but not limited to, the right to file pleadings, conduct discovery, introduce evidence at proceedings, issue and enforce subpoenas, present and enforce the attendance of witnesses, initiate and pursue proceedings in contempt, and file motions to modify and amend the

---

the necessity of an overt intrusion into Michigan's executive and legislative sovereignty.

The district court's reliance upon the Supreme Court's decision in *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), to support its conclusion to order disclosure of peer review documents is misplaced and easily distinguished from the case at hand. The most obvious of those distinctions include the absence, in *Pennsylvania,* of a legislatively created privilege to protect the confidentiality of peer review material to insure the objectivity, accuracy, integrity, and reliability of the audit, the absence of a consent decree agreement that endorsed the requirement of confidentiality to ensure the objectivity and integrity of the peer review procedure and approved the summarized reporting of the internal audit results, and the ready availability, in the instant case, of collateral sources from which to generate the information without disturbing the confidentiality of the peer review procedures and without forcing Michigan to violate existing valid statutory enactments.

Contrary to the district court's assertions, its concession to permit Michigan to redact individual names from the medical/mental health/dental care internal draft audits does not effectively protect the confidentiality of the procedure because pragmatism dictates that criticisms by the relatively few members of the health care supervisory staff at consent decree institutions are easily attributable to individual peer members charged with conducting the reviews. Accordingly, this court concludes that the summarized reports of the internal draft medical/mental health/dental care audits, which have been available to the participating parties during the last five years of this litigation, and which the court has characterized as all-inclusive, objective, accurate, and reliable, satisfy the dictates of the consent decree and more than adequately ensure that appropriate services are provided prisoners, that those services are timely and performed by qualified providers in accordance with contemporary standards of professional practice, and that any problems, shortcomings, or inadequacies in providing health care are timely identified and corrected. Standing alone, the district court's conjecture that the mandated modification of the consent decree *might* lead to relevant evidence, without valid probative factual support, falls short of convincing this court that the modification here in controversy was justified or that its injunction did not constitute an abuse of discretion.

Neither amicus, the United States, the magistrate, nor the district court have presented a compelling reason to support a departure from the agreement expressed in the consent decree. The mandate of the April 4, 1990 order is, for the reasons discussed herein, an overly intrusive and unnecessary incursion into Michigan's executive and legislative sovereignty which offends the principles of federalism and comity.

agreement between the United States and Michigan embodied in the July 16, 1984 consent decree and state plan.

There can be little doubt from the record of this appeal that the *Knop* class, in its role of "litigating amicus curiae" and exercising the authority of a named party/real party in interest, has virtually assumed effective control of the proceedings in derogation of the original parties to this controversy. The creation of this legal mutant characterized as "litigating amicus curiae," as demonstrated by the cascading acrimony among the participants to this litigation, if accorded precedential viability, will implicate and erode the future core stability of American adversary jurisprudence as we know it today. Neither the appellees nor the trial court have advanced, beyond conclusory generalizations and conjecture, a persuasive argument that the trial court's "litigating amicus curiae" order, whatever that term implies, does not seriously impinge the inherent rights of the only real parties in interest to this CRIPA litigation between the United States and Michigan. The district court's order has, by extrajudicial edict, impressed upon the United States and Michigan a third-party legal interloper in the persona of the NPP–ACLU and the ACLUFM acting through their structured willing surrogate, the *Knop* class, all of whom had been denied real-party-in-interest status and whose efforts to achieve that end had been earlier barred by the trial court. The legal consequence of the district court's order was to achieve, by circumvention, a result that effectively and impermissibly abused all conventional laws and judicial rules of civil practice and procedure for acquiring the status and rights of a named party/real party in interest, including Fed.R.Civ.P. 14 and 17 through 25.

Challenged by the characterization of "litigating amicus curiae," which is not referenced in any legal dictionary, congressional enactment, judicial promulgation, the Federal Criminal Code and Rules, nor the Federal Civil Judicial Procedures and Rules, this court conducted exhaustive research in an effort to search for the identity of this illusive trial court-created mutant. Although a limited number of district courts within the Fifth, Ninth, and Eleventh Circuits and the Ninth Circuit Court of Appeals on a single occasion have applied the characterization of "litigating amicus curiae" to nonparties in interest to a cause of action, the cases afford no assistance in defining or positioning the concept within the evolution of American adversary jurisprudence because, in each instance, the participation of a "litigating amicus curiae" was permitted by agreement of the named parties to the controversy.[13] Accordingly, integral to this appeal as an issue of first impression is the identification of this elusive apparition "litigating amicus curiae."

Historically, "amicus curiae" was defined as one who interposes "in a judicial proceeding to assist the court by giving information, or otherwise, or who conduct[s] an investigation or other proceeding on request or appointment therefor by the court." 4 Am.Jur.2d, Am.Cur. § 1, at 109 (1962). *See Leigh v. Engle*, 535 F.Supp. 418, 419–20 (N.D.Ill.1982). Its purpose was to provide *impartial* information on matters of law about which there was doubt, especially in matters of public interest. *Miller–Wohl Co. v. Commissioner of Labor & Indus., State of Montana*, 694 F.2d 203, 204 (9th Cir.1982); 4 Am.Jur.2d, Am. Cur. §§ 1, 2 at 109–10; *Leigh*, 535 F.Supp. at 420. The orthodox view of amicus curi-

---

**13.** Appellees have cited the following cases to support their claim that a "litigating amicus" is an entity recognized by the federal court system: *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982); *Dove v. Chattanooga Area Regional Transp. Auth.*, 701 F.2d 50 (6th Cir.1983), *aff'g* 539 F.Supp. 36 (E.D.Tenn.1981); *In re Estelle*, 516 F.2d 480 (5th Cir.1975); *DeVonish v. Garza*, 510 F.Supp. 658 (W.D.Tex.1981); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976); *Morales v. Turman*, 364 F.Supp. 166 (E.D.Tex.1973); *Wyatt v.*

*Stickney*, 344 F.Supp. 373 (M.D.Ala.1972). These cases do not, however, aid appellee's proposition. In none of the cases was the concept of "litigating amicus curiae" nor the scope of their participation addressed by the court as an issue, nor was the term defined within the context of a "case or controversy" seeking the resolution of the court. The term "litigating amicus curiae" does not appear nor is it alluded to in the *Estelle, Wyatt, Pugh, Morales,* or *Dove* opinions.

ae was, and is, that of an *impartial* friend of the court—*not an adversary party in interest in the litigation. Miller–Wohl,* 694 F.2d at 204. The position of classical amicus in litigation was not to provide a highly partisan account of the facts, but rather to aid the court in resolving doubtful issues of law. *New England Patriots Football Club, Inc. v. University of Colorado,* 592 F.2d 1196, 1198 n. 3 (1st Cir. 1979); *Leigh,* 535 F.Supp. at 420. Over the years, however, some courts have departed from the orthodoxy of amicus curiae as an impartial friend of the court and have recognized a *very limited* adversary support of given issues through brief and/or oral argument. *Funbus Sys., Inc. v. California Pub. Util. Comm'n,* 801 F.2d 1120, 1124–25 (9th Cir.1986); Krislov, *The Amicus Curiae Brief: from Friendship to Advocacy,* 72 Yale L.J. 694 (1963).

Classical participation as an amicus to brief and argue as a friend of the court was, and continues to be, a privilege within "the sound discretion of the courts," *see Northern Sec. Co. v. United States,* 191 U.S. 555, 24 S.Ct. 119, 48 L.Ed. 299 (1903); 4 Am.Jur.2d, Am.Cur § 4 at 113, depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice. *Leigh,* 535 F.Supp. at 420. Amicus, however, has never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest, *Miller–Wohl Co.,* 694 F.2d at 204, and amicus has been consistently precluded from initiating legal proceedings, filing pleadings, or otherwise participating and assuming control of the controversy in a totally adversarial fashion. *Moten v. Bricklayers, Masons and Plasterers Int'l Union of Am.,* 543 F.2d 224, 227 (D.C.Cir. 1976) (per curiam) (amicus may not appeal judgments); *State ex rel. Baxley v. Johnson,* 293 Ala. 69, 300 So.2d 106, 111 (1974) (per curiam) (amicus is not a party and cannot assume the functions of a party nor control litigation); *Silverberg v. Industrial Comm'n,* 24 Wis.2d 144, 128 N.W.2d 674, 680 (1964) (amicus brief seeking to challenge validity of testimony in the record stricken because attempt to challenge was not a proper function of amicus); 4 Am. Jur.2d, Am.Cur. §§ 3, 6 at 111, 114. *See City of Winter Haven v. Gillespie,* 84 F.2d 285 (5th Cir.), *cert. denied,* 299 U.S. 606, 57 S.Ct. 232, 81 L.Ed. 447 (1936). Historically, an amicus could not join issues not joined by the parties in interest, *e.g., National Comm'n on Egg Nutrition v. F.T.C.,* 570 F.2d 157, 160 n. 3 (7th Cir.1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978); *In re Buffalo,* 57 A.D.2d 47, 394 N.Y.S.2d 919, 921 (1977); *Phoenix v. Phoenix Civic Auditorium & Convention Center Ass'n,* 99 Ariz. 270, 408 P.2d 818, 821 (1965) (amicus cannot create, extend, or enlarge issue), and was not bound by the judgments in actions in which amicus was permitted to brief or argue. *Munoz v. County of Imperial,* 667 F.2d 811, 816–17 (9th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982); *TRW, Inc. v. Ellipse Corp.,* 495 F.2d 314, 318 (7th Cir. 1974); 4 Am.Jur.2d, Am.Cur. § 3, at 112.

Historically, there has been a bright-line distinction between amicus curiae and named parties/real parties in interest in a case or controversy. Standing to litigate equal to that exercised by named parties/real parties in interest may be acquired or conferred only pursuant to Fed. R.Civ.P. 14 and 17 through 25. *See Ex parte Cutting,* 94 U.S. 12, 20–21, 24 L.Ed. 69 (1876) (in pre-Civil Rules case, Supreme Court recognized intervention only upon petition for formal intervention, which was granted either expressly or through the actions of the lower court consistent with intervention); *Miller–Wohl,* 694 F.2d at 204 ("A petition to intervene and its express or tacit grant are prerequisites to this treatment [as an intervenor].") The intent and purpose of the Federal Rules should not be evaded by acts of judicial legerdemain. Amicus curiae may not and, at least traditionally, has never been permitted to rise to the level of a named party/real party in interest nor has an amicus curiae been conferred with the authority of an intervening party of right without complying with the requirements of Fed.R.Civ.P. 24(a), nor accorded permissible intervention without meeting the criteria of Fed.R.Civ.P. 24(b).

Only a named party or an intervening real party in interest is entitled to litigate on the merits, *e.g., Miller–Wohl,* 694 F.2d at 204; *Schneider v. Dumbarton Developers, Inc.,* 767 F.2d 1007, 1017 (D.C.Cir.1985); *Gilbert v. Johnson,* 601 F.2d 761, 768 (5th Cir.1979) (Rubin, J., concurring); *cf. Ross v. Bernhard,* 396 U.S. 531, 541 n. 15, 90 S.Ct. 733, 740 n. 15, 24 L.Ed.2d 729 (1970), and there is little doubt from the record that the district court, in the instant case, has conferred named party/real party in interest status upon the *Knop* class under the appellation of "litigating amicus curiae" and has invested the *Knop* class with equal standing to litigate this CRIPA action on the merits, thus divesting the original parties, the United States and the State of Michigan, of effective control of their litigation. It is reasonable to conclude from the evolution of amicus curiae that the judicial fiat of "litigating amicus curiae" in the instant case transcends the traditional concept of that term within accepted jurisprudence.

Forgetting, for the moment, the lexicology applied by the trial court to its judicial creativity and juxtaposing the broad authority conferred upon the *Knop* class with the rights equal to those of a named party/real party in interest, it becomes facially apparent that the trial court has, subsequent to the execution of the court-approved consent decree, by judicial legislation, impressed upon the United States as plaintiff and the State of Michigan as defendant in this CRIPA action an intruder with equal litigating rights of a named party/real party in interest, thereby subverting the right of the United States and Michigan to effectively control the future course of the proceedings.

The record of these turbulent proceedings attests to the position, declared in open court, of the NPP–ACLU and the ACLUFM that their interests and the interests of the *Knop* class were and continue to be adverse to the interests of both the United States and Michigan, the real parties in interest to this litigation. The unnecessary, overly intrusive, and indiscriminate course of litigating conduct demonstrated by the *Knop* amicus curiae in exer-

cising the court-conferred litigating rights equal to a named party/real party in interest have exacerbated, if not caused, much of the discord, bitter confrontation, and continuing acrimony that has pervaded these proceedings since it moved to secure its domination over the directional course and objectives of these post-judgment proceedings, all of which has noticeably protracted and impeded the orderly implementation of the consent decree and delayed the benefits and results anticipated to be derived therefrom. To condone the fiction of "litigating amicus curiae," in reality an extrajudicial, de facto named party/real party in interest, would extend carte blanche discretion to a trial judge to convert the trial court into a free-wheeling forum of competing special interest groups capable of frustrating and undermining the ability of the named parties/real parties in interest to expeditiously resolve their own dispute and capable of complicating the court's ability to perform its judicial function. The record fails to disclose any result, beyond disrupting the implementation of a court-approved, negotiated consent decree, that the NPP–ACLU, the ACLUFM, and the *Knop* class cannot achieve as traditional amicus curiae without the necessity of opening this judicial Pandora's box and releasing a prolific source of legal confusion upon the bench, the bar, and the public in this and future cases in controversy.

Accordingly, it is the conclusion of this court that the *Knop* class is without standing to compel the disclosure of internal medical/mental health/dental care draft peer audits pursuant to the district court's order of April 4, 1990, or to exercise any litigating rights equal to a named party/real party in interest conferred by the district court under the characterization of "litigating amicus curiae" including, as a condition precedent for court consideration, the right to endorse or veto any state-proposed action. The *Knop* class is, however, not precluded from continued participation in this action in the traditional role of amicus curiae, and may, within the discretion of the court, argue its adversarial position either orally or by written briefs. Michi-

gan shall continue to furnish the *Knop* class with informational copies of all "reports, plans, pleadings, memoranda, or other documentation" it has agreed to furnish to the court and the United States pursuant to paragraphs I, J, K, and L of the consent decree. Accordingly, the April 4, 1990 order of the district court is REVERSED.

To summarize, the common thread of inquiry confronting this appellate review is whether the district court has overzealously breached precepts of federalism and comity by fashioning and imposing overly intrusive prison administrative procedures, more appropriately left to the better understanding, grasp, and expertise of prison administrators and which are within the peculiar province of state executive and legislative sovereignty. The clarion edict of the Supreme Court more than a decade ago, in language that needs no interpretation, declared:

> It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. * * * The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prison.

*Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1937–38, 36 L.Ed.2d 439 (1973). *See also Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983); *Chapman,* 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14; *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

The court's pronouncements in *Rodriguez* have been consistently echoed in a proliferation of its progeny without erosion or departure and adopted by this circuit and virtually every other circuit addressing issues of prison administration:

> [The] underlying and restrictive principles of comity and federalism are perhaps nowhere more compelling than in actions seeking relief against unconstitutional practices, policies and conduct manifest in state penal institutions. The rationale was articulated by the Supreme Court more than a decade ago[.]

\*　　\*　　\*　　\*　　\*　　\*

Federal restraint into intrusion of a state penal institution is counseled for at least two reasons:

> [J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the providence of the Legislative and Executive Branches of our Government not the Judicial.

*Kendrick v. Bland,* 740 F.2d 432, 437–38 (6th Cir.1984) (quoting *Wolfish,* 441 U.S. at 548, 99 S.Ct. at 1879) (citing *Arruda v. Fair,* 710 F.2d 886 (1st Cir.1983); *Sampson v. King,* 693 F.2d 566 (5th Cir.1982); *Newman v. Alabama,* 683 F.2d 1312, 1320 (11th Cir.1982)).

This circuit has also directed that federal equity courts, in fashioning a remedy designed to correct constitutional infringements, must afford relief which is "no broader than necessary to remedy the constitutional violation." *Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982) (quoted in *Kendrick,* 740 F.2d at 437). *See also Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851, 862–63 (1977); *Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544–45, 47 L.Ed.2d 792, 801 (1976); *Ruiz v. Estelle,* 679 F.2d 1115, 1145 (5th Cir.1982) *vacated in part on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983) ("We should, therefore, fashion 'the least intrusive remedy that will still be effective' "); *Newman v. Alabama,* 559 F.2d 283, 287 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Accordingly, it was incumbent upon the district court in the action sub judice to impose the least intrusive remedies available in resolving the is-

sues reviewed in this appeal. The trial court, having acknowledged the teachings of the Supreme Court addressing state penal institutional administration, was remiss in not fashioning its dispositions in accordance with those directional dictates:

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible to resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of *which are peculiarly within the province of the legislative and executive branches of government.* For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Martinez,* 416 U.S. at 404–05, 94 S.Ct. at 1807 (footnote omitted) (quoted in *Chapman,* 452 U.S. at 351 n. 16, 101 S.Ct. at 2401–02 n. 16). *See also Wolff v. McDonnell,* 418 U.S. 539, 561–62, 568, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974); *North Carolina Prisoners' Labor Union,* 433 U.S. at 125, 97 S.Ct. at 2537.

Recognizing the oversight responsibility of the trial court in the instant case to scrutinize charges of cruel and unusual conditions of confinement in the identified institutions of correction here in controversy and to discharge its duty to protect the constitutional rights of inmates detained therein, the trial court should not have assumed that Michigan's legislature and prison officials were and continue to be insensitive to requirements of the Constitution or to the perplexing problems of how best to achieve the ultimate objectives of the penal function in the criminal justice system. *Chapman,* 452 U.S. at 352, 101 S.Ct. at 2402. The trial court should have assiduously avoided its inextricable entanglements in the minutiae of prison administration which only distracted it from a detached consideration and resolution of the single overriding issue of the constitutional infringements seeking resolution. The trial court should have been mindful that charges of cruel and unusual punishment spring from *affirmative proof of constitu-*tional infringements and that judicial answers *"must reflect that fact rather* [a] *trial court's idea of how best to operate a detention facility." Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874 (emphasis added).

Michigan has demonstrated a good faith effort to accomplish prison reforms of magnitude at the institutions named in the complaint involving a commitment of millions of dollars as evidenced by the scope of its agreement with the United States memorialized in the consent decree and state plan endorsed by the trial court on July 16, 1984. The United States, with its unlimited pool of financial and capable professional resources, has aggressively and effectively pursued the implementation of that decree with Michigan within the congressional intent of CRIPA, and the trial court, should not, directly or indirectly through a special master, independent expert, or some extraneous participant, impose overly intrusive remedies upon the state, but should exercise restraint and reason in performing its oversight responsibility.

It is ordered that this consolidated appeal is REMANDED to the district court for further proceedings not inconsistent with this decision.

Judge BOGGS concurs in the result only.